Joseph W. Cotchett (SBN 36324)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christopher F. Jeu (SBN 247865)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & MCCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
ldevens@cpmlegal.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE COUNTY OF SAN MATEO, and those similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., ELEVATE TEXTILES, INC., FIRE-DEX, LLC, GLOBE MANUFACTURING COMPANY, LLC, W.L. GORE & ASSOCIATES, INC., HONEYWELL SAFETY PRODUCTS USA, INC., INNOTEX, INTERTECH GROUP, INC., LION GROUP, INC., MILLIKEN & COMPANY, MORNING PRIDE MANUFACTURING L.L.C., PBI PERFORMANCE PRODUCTS, INC., SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC., STEDFAST USA, INC., and TENCATE PROTECTIVE FABRICS USA,<br><br>    Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **CIVIL RICO**<br>2. **COMMON LAW CONSPIRACY**<br>3. **STRICT LIABILITY – DESIGN DEFECT**<br>4. **STRICT LIABILITY – FAILURE TO WARN**<br>5. **FRAUDULENT CONCEALMENT AND NEGLIGENT MISREPRESENTATION**<br>6. **BREACH OF EXPRESS WARRANTY**<br>7. **BREACH OF IMPLIED WARRANTY**<br>8. **BREACH OF WARRANTY FOR FITNESS FOR PARTICULAR PURPOSE**<br>9. **NEGLIGENCE**<br>10. **UNJUST ENRICHMENT**<br>11. **CALIFORNIA UNFAIR COMPETITION**<br>12. **CALIFORNIA FALSE ADVERTISING**<br>13. **STATE CONSUMER PROTECTION LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page No.**

I.     INTRODUCTION ................................................................................................... 1

II.    PARTIES ............................................................................................................... 5

    A.    Plaintiff County of San Mateo ................................................................... 5

    B.    Defendants ................................................................................................. 6

III.   JURISDICTION AND VENUE ........................................................................... 12

IV.    FACTUAL ALLEGATIONS ............................................................................... 13

    A.    The History of PFAS, Turnout Gear, and the Major Effects of PFAS on the
        Environment and Human Health ............................................................... 13

    B.    Defendants' PFAS-Laden Turnout Gear Poses Serious Health and Environmental
        Risks ......................................................................................................... 20

    C.    Firefighters' Exposure to PFAS ................................................................ 23

    D.    Defendants' Knowledge of PFAS Toxicity ............................................... 26

        1.    3M Has Long Known of the Dangers Caused by PFAS .............................. 27

        2.    DuPont has Long Known of the Dangers of PFAS .................................... 29

        3.    The Remaining Defendants' Knowledge of the Dangers of PFAS ............. 34

    E.    Defendants Conspired to Cover Up and Conceal PFAS Risks From the Public ..... 37

    F.    Defendants Failed to Provide Adequate Warnings of PFAS Risks ......................... 41

    G.    Defendants Had the Ability to Design Safer Turnout Gear ................................... 42

    H.    Defendants Failed to Disclose the Unfit Dangerous Nature of the Turnout Gear ... 43

V.     CLASS ALLEGATIONS ..................................................................................... 44

    A.    Tolling and Estoppel of Applicable Statute of Limitations ..................................... 46

    B.    Fraudulent Concealment Tolling .................................................................. 47

VI.    CLAIMS FOR RELIEF ....................................................................................... 47

    A.    The Members of the PFAS Cover-up Enterprise .................................................... 48

    B.    RICO Predicate Acts ................................................................................ 52

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                                    i

VII.    PRAYER FOR RELIEF ........................................................................................... 103

VIII.   JURY DEMAND ................................................................................................... 104

**CLASS ACTION COMPLAINT**                                                                              ii

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff, the County of San Mateo, on behalf of itself and all others similarly situated, brings this Class Action Complaint for damages and for equitable and injunctive relief against Defendants. Plaintiff makes the following allegations based on knowledge as to its own actions, the facts and circumstances, and the reasonable investigation of counsel, information and belief, and a review of publicly available materials.

## I.    INTRODUCTION

1.    Plaintiff, the County of San Mateo ("Plaintiff," "County," or "San Mateo") is a political subdivision of the State of California. The County comprises numerous agencies, departments, and functions. The County's functions include the San Mateo County Fire Department, whose mission is to safeguard life, property, and natural resources through effective fire prevention, suppression, and emergency response. The County is responsible for the cost of the San Mateo County Fire Department's equipment, tools, and gear. As such, like all others similarly situated ("Class Members"), the County is financially responsible for the protective gear for the respective fire department's firefighters.[1]

2.    The County and other Class Members have bought, paid for, and/or otherwise provided specialized occupational personal protective equipment ("PPE"), which includes hoods, helmets, coats, pants, gloves, boots, reflective tape, and other multilayered PPE ("Turnout Gear").

3.    The County brings this action on behalf of itself and those similarly situated against Defendants EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., (collectively, "DuPont Defendants"), 3M Company (f/k/a Minnesota Mining and Manufacturing Company), Elevate Textiles, Inc., Fire-Dex, LLC, Globe Manufacturing Company, LLC, W.L. Gore & Associates, Inc., Honeywell Safety Products USA, Inc., Innotex, InterTech Group, Inc., Lion Group, Inc., Milliken & Company, Morning Pride Manufacturing L.L.C., PBI Performance Products, Inc., Safety Components Fabric Technologies, Inc., StedFast USA, Inc., and TenCate Protective Fabrics USA (collectively, "Defendants") for harm

---

[1] *See* County of San Mateo, *San Mateo County Fire Department*, https://www.smcgov.org/san-mateo-county-fire.

**CLASS ACTION COMPLAINT**                                                                 1

resulting from the purchase, provision, use of, and dependence upon Turnout Gear that contains hazardous levels of toxic, carcinogenic, synthetic per- and polyfluoroalkyl substances ("PFAS").

4.  PFAS are toxic, synthetic chemical compounds made of nearly indestructible chains of carbon and fluorine atoms. PFAS accumulate and concentrate in the human body with exposure. Once released into the environment and the human body, PFAS persist for long, if not indefinite, periods of time, earning them the nickname "forever chemicals."

5.  The Turnout Gear that was manufactured, put into the stream of commerce, and marketed by the Defendants to be purchased, paid for, and/or provided by the County and other Class Members was treated with PFAS. PFAS are highly toxic chemicals, immunotoxic agents, and carcinogenic compounds that have posed and continue to pose a serious risk of injury to the health and safety of the firefighters and others exposed to the chemicals through Turnout Gear use, cleaning, and storage.[2]

6.  The PFAS in the Defendants' Turnout Gear do not remain contained or stable. Rather, the PFAS concentrations and migration substantially increase when exposed to physical stressors associated with firefighting activities. Accordingly, the PFAS in the contaminated Turnout Gear ("PFAS Turnout Gear") leach, shed, crumble, abrade, off-gas (a process in which a chemical is emitted in the form of a gas), and otherwise migrate out of the PPE, causing unreasonably dangerous exposure and contamination of the County and Class Members' firefighters, fire stations, fire trucks, occupational equipment, personal property, firehouse furnishings, lockers and storage areas, laundering equipment and facilities, bunk rooms, other surrounding property, and other exposed employees and persons.[3]   Accordingly, Defendants' PFAS Turnout Gear has caused

---

[2] *See, e.g.,* Nat'l Toxicology Program, U.S. Dept. of Health & Human Servs., NTP MONOGRAPH ON IMMUNOTOXICITY ASSOCIATED WITH EXPOSURE TO PERFLUOROOCTANOIC ACID OR PERFLUOROOCTANE SULFONATE (Sept. 2016) ("NTP MONOGRAPH: IMMUNOTOXICITY"), *available at* https://ntp.niehs.nih.gov/sites/default/files/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf; Nur-Us-Shafa Mazumder, *et al.,* "Firefighters' Exposure to Per-and Polyfluoroalkyl Substances (PFAS) as an Occupational Hazard: A Review," FRONTIERS IN MATERIALS (Mar. 2023) ("Mazumder, "Firefighters' Exposure to PFAS").
[3] *See, e.g.,* Anna S. Young *et al*., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. EXPO. SCI. & ENVIRON. EPIDEMIOLOGY (Feb. 2021), *available at* https://www.nature.com/articles/s41370-021-00288-7.

**CLASS ACTION COMPLAINT**                                                                        2

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

property damage to the County and Class Members' facilities. In addition, Defendants' PFAS Turnout Gear has created an unreasonable risk of harm for the County and Class Members' firefighters.

7. Defendants, who knew for decades that PFAS chemicals posed major health risks, through a common enterprise ("PFAS Cover-up Enterprise"), sold, marketed, and otherwise supplied PFAS Turnout Gear to the County and proposed Class Members without disclosing the toxicity of the PFAS Turnout Gear. Rather, for decades, ***Defendants suppressed negative scientific research*** regarding PFAS. In addition, Defendants made misleading statements to the public about the safety of the PFAS in Turnout Gear. Accordingly, for decades, Defendants, through a common enterprise, promoted, sold, and otherwise distributed PFAS Turnout Gear that created an unreasonable risk of harm.

8. Defendants, fraudulently concealing negative scientific research, failed to disclose to fire departments and public entities using Turnout Gear that the PFAS in Turnout Gear is highly dangerous to health, property, and the environment. Instead, Defendants collaborated to conceal the truth, and such concealment was a common purpose of the PFAS Cover-up Enterprise.

9. The County and Class Members purchased and/or paid for the PFAS Turnout Gear to protect firefighters' health and safety from the extreme conditions of firefighting activities"[4] Instead, Defendants' PFAS Turnout Gear has released toxic PFAS that are absorbed, inhaled, and ingested by Plaintiff's and Class Members' firefighters and that accumulate in the firefighters' bodies, resulting in unreasonable exposure to toxic chemicals that are known to cause cancer, immune system disorders, and other harmful health conditions.

10. When exposed to heat, ultraviolet light, water, and routine wear, PFAS in Defendants' Turnout Gear off-gas, break down, and degrade into highly mobile and toxic particles and dust, further accelerating contamination of their surrounding environment and human PFAS exposure.

---

[4] Andrew Maizel *et al*., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (May 2023) ("Maizel, 'PFAS in New Firefighter Turnout Gear Textiles'"), *available at* https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

**CLASS ACTION COMPLAINT**                                                                 3

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

11.    Exposure to PFAS can lead to numerous adverse health effects, including the increased risk of cancer; decreased fertility; and the reduced ability of the body's immune system to fight infections.  Over the past forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.  Firefighter occupational cancer has become the "leading cause of line-of-duty death in the fire service."[5]  Approximately *seventy percent of firefighters* are *predicted to eventually die from cancer*, which is significantly higher than the general population.[6] The change over the decades closely corresponds to when Defendants' added PFAS to firefighters' PPE and commercialized PFAS Turnout Gear.

12.    Facing mounting peer-reviewed scientific research, increased public awareness, demands for transparency and disclosure, and growing state law and municipal prohibitions on PFAS in Turnout Gear, Defendants have recently begun publicly acknowledging that the PFAS – especially the concentrations included in Turnout Gear – are unreasonably dangerous.  In December 2022, Defendant 3M Company ("3M") announced that it would exit all PFAS manufacturing and work to discontinue its use of PFAS across its product portfolio by the end of 2025.[7]  Thus, Defendants have recently been shifting their focus to monetizing the need for PFAS-free Turnout Gear.

13.    As explained by Defendant Milliken, which is a manufacturer of textiles for firefighter Turnout Gear: "*Milliken saw the writing on the wall and got to work*."[8]  The "writing on the wall" was *"[t]he growing chorus of concern over the last several years from firefighters,*

---

[5] International Association of Fire Fighters, *Fire Fighter Cancer Awareness Month*, https://www.iaff.org/cancer-awareness-month

[6] Graham F. Peaslee, *et al.*, "Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles," ENVIRONMENTAL SCIENCE & TECHNOLOGY LETTERS (June 2020) 594–99*, available at* https://dx.doi.org/10.1021/acs.estlett.0c00410 ("Peaslee study").

[7] 3M, *3M's PFAS Stewardship*, https://www.3m.com/3M/en_US/pfas-stewardship/uses-applications/?utm_medium=redirect&utm_source=vanity-url&utm_campaign=pfas.3m.com/pfas_uses.

[8] Milliken, *Why is PFAS Used in Firefighters Protective Gear*, *available at*  (emphasis added); *available at* https://www.milliken.com/en-us/businesses/textile/blogs/why-is-pfas-used-in-firefighters-protective-gear; https://web.archive.org/web/20251012085102/https://www.milliken.com/en-us/businesses/textile/blogs/why-is-pfas-used-in-firefighters-protective-gear.

**CLASS ACTION COMPLAINT**                                                                                              4

*lawmakers, insurers, and environmentalists,"* which *"has all but guaranteed that use of PFAS was going away sooner rather than later*."[9]

14.    At least as of 2025, PFAS-free Turnout Gear was available in the marketplace that complied with the water-repellent and heat-resistant characteristics for firefighter PPE, which are illustrated in applicable National Fire Protection Association ("NFPA") standards.  Such PFAS-free Turnout Gear would have been available much earlier if Defendants had focused earlier on making it available in to ensure the safety of firefighters' Turnout Gear rather than attempting to suppress information regarding PFAS.  Toxic PFAS contamination is ongoing and escalating.  Unless and until the PFAS Turnout Gear is disposed of, and the contaminated property effectively remediated, and the equipment replaced, the unreasonably dangerous toxic exposure and contamination will continue—even escalating due to the weathering and leaching of PFAS in older PFAS Turnout Gear—causing bodily harm and property damage to fire stations and the surrounding environment.

15.    Fire departments exist for the safety, health, and general welfare of the public.  Plaintiff's firefighters perform their fire-protection and emergency services for the safety, health, and welfare of the public.  The County is asserting public rights and the public interest in pursuing legal remedies against Defendants to recover the costs of purchasing the Turnout Gear, remediation, repair, and replacement of their property contaminated by PFAS and elimination of the ongoing toxic exposure of their firefighters and other exposed persons to unreasonably dangerous PFAS known to cause cancer and other serious injuries to human health.

## II.    PARTIES

### A.    Plaintiff County of San Mateo

16.    The County of San Mateo, which is a political subdivision of the State of California, is located in the San Francisco Bay Area, with its county seat in Redwood City.  From a geographical

---

[9] Jesse Roman, Emergency Response, "Deadline Pressure:  Ahead of the Most Consequential Changes to Firefighter Personal Protective Equipment (PPE) in Decades, Dozens of Experts from an Array of Fields Met at NFPA to Discuss the Transition, the Many Unknowns, and What Fire Departments Need To Know," NAT'L FIRE PROTECTION ASSOC. J. (Apr. 16, 2025), https://www.nfpa.org/news-blogs-and-articles/nfpa-journal/2025/04/14/deadline-pressure(emphasis added).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

standpoint, the County comprises twenty (20) incorporated cities and 455 square miles of land.  San Mateo County's population is approximately 771,000 people.[10]

17.    The San Mateo County Fire Department's mission is to safeguard life, property, and natural resources through effective prevention, fire suppression, and response. The San Mateo County Fire Department provides a variety of services, including fire suppression, emergency medical care, and rescue operations, from five fire stations serving the unincorporated areas of the county. The County is financially responsible for the San Mateo County Fire Department's equipment, tools, and gear – including Turnout Gear.[11] Being financially responsible for the purchase of PPE, the County utilizes Turnout Gear from one or more of the Defendants.

### B.    Defendants

18.    For decades, PFAS Turnout Gear has been designed, tested, manufactured, marketed, sold, and applied through the collective, organized, and highly interdependent contributions of Defendants.  Each Defendant contributes a necessary and essential component, material, chemical, or related service, without which the PFAS Turnout Gear could not be produced and sold.  And each Defendant knows and intends that its products and services will be combined to create the final PFAS Turnout Gear purchased and/or paid for by Plaintiff and the Class Members for use by their firefighters.

*PFAS Chemical Finish Defendants*

19.    The DuPont Defendants and 3M (collectively the "PFAS Chemical Finish Defendants") design, manufacture, market and sell PFAS performance chemistries for high-hazard clothing such as the durable water-and- oil repellants, fluorochemical finishes, coatings, surfactants, adhesives, fluoropolymer dispersions, membrane coatings, adhesion promoters, finishing sprays, repellency boosters, and DWR coatings; as well as PFAS performance chemicals applied to the fabrics, textiles, adhesives, reflective tape, and assembled Turnout Gear (*i.e.*, PFAS tapes, adhesives and finishing sprays) (collectively "PFAS Chemical Finishes").

[10] *See* County of San Mateo, *Fast Facts*, *available at* https://www.smcgov.org/fast-facts.
[11] County of San Mateo, *San Mateo County Fire Department*, *available at* https://www.smcgov.org/san-mateo-county-fire.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

20. The PFAS Chemical Finish Defendants make the PFAS molecules, such as fluorotelomer alcohols ("FTOHs"), fluorinated acrylates, perfluorinated surfactants, and side-chain fluorinated polymers that are the building blocks of the PFAS Chemical Finishes.

21. The PFAS Turnout Gear paid for by the County and other Class Members contains PFAS Chemical Finishes designed, manufactured, marketed, and sold by at least one, often multiple, PFAS Chemical Finish Defendants.

22. The PFAS Finish Defendants invented, developed, and commercialized PFAS Chemical Finishes into an essential component in the billion-dollar Turnout Gear industry.

*Defendant 3M*

23. 3M, which is formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States and California. 3M's principal place of business is in St. Paul, Minnesota.

24. 3M's PFAS Chemical Finishes were among the earliest that were used in Turnout Gear, and they included perfluorooctane sulfonate ("PFOS"), PFOS-based surfactants and repellants, and Scotchgard™ fluorochemical repellents (legacy versions).

25. In addition to PFAS Chemical Finishes, 3M invented, designed, manufactures, markets, and sells 3M™Scotchlite™ Reflective Tape, which contains PFAS and is used on the PFAS Turnout Gear that was paid for, provided and used by Plaintiff, members of the putative class, and their firefighters.

26. 3M was the dominant manufacturer and supplier of PFAS Chemical Finishes until 2002, and it is still the world's largest PFAS tape and adhesive manufacturer.

*DuPont Defendants*

27. The Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., Chemours, Chemours FC, and Corteva, collectively, as the "DuPont Defendants" or "DuPont."

28. Defendant EIDP, Inc., which is formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States, including in California. EIDP, Inc.'s principal place of business is in Wilmington, Delaware.

29.     Defendant DuPont de Nemours, Inc. is a Delaware corporation that does business throughout the United States, including in California. DuPont de Nemours, Inc.'s principal place of business is in Wilmington, Delaware.

30.     Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States, including in California. Chemours's principal place of business is in Wilmington, Delaware.  In 2015, EIDP, Inc. spun off its performance chemical business as a new, publicly traded company, Chemours.  In connection with the transfer, Chemours assumed certain EIDP, Inc. assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and sale of the PFAS Chemicals that are the subject of this Action.

31.     Defendant The Chemours Company FC, LLC ("Chemours FC") is a  Delaware limited liability company that does business throughout the United States, including in California. Chemours FC's principal place of business is in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours, and it manufactures PFAS Chemicals that are the subject of this Action.

32.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in California.  Corteva's principal place of business is Wilmington, Delaware. In 2019, DuPont de Nemours, Inc. spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds EIDP, Inc. as a subsidiary. In connection with these transfers, Corteva assumed certain EIDP, Inc. assets and liabilities, including business lines and liabilities relating to the design, manufacture, marketing, distribution, and sale of the PFAS Chemicals that are the subject of this Action.

33.     DuPont has long been a leading PFAS manufacturer.  In approximately 2002, PFOS were phased out, and DuPont replaced 3M as the dominant supplier of FTOHs, C6 fluorotelomer acrylates, Zonyl™ fluorochemical repellents, and Capstone™ repellents – all which are PFAS.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                              8

*PFAS Fabric Producer Defendants*

34.    The PFAS Fabric Producer Defendants design, market, and sell the PFAS Fabrics that have been used in PFAS Turnout Gear to entities that design, assemble, market, and sell the finished Turnout Gear.

35.    The PFAS Turnout Gear purchased and/or paid for by Plaintiff and Class Members contains PFAS Fabrics designed, manufactured, marketed, and sold by at least one, often multiple, PFAS Fabric Producer Defendants.

36.    PFAS Fabric Producer Defendants purchase PFAS Chemical Finishes for application and use in Turnout Gear fabrics, textiles, and moisture barriers ("PFAS Fabrics"), including for the outer shells, thermal liners, and moisture-barrier substrates.

37.    Defendant Elevate Textiles, Inc. ("Elevate Textiles") is a Delaware corporation that does business throughout the United States.  Elevate Textiles has its principal place of business in Charlotte, North Carolina. Elevate Textiles is the corporate parent of Defendant Safety Components Fabric Technologies, Inc.

44.    Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including in California. Gore has its principal place of business in Newark, Delaware.

45.    Defendant The InterTech Group, Inc. ("InterTech") is a South Carolina corporation that does business throughout the United States. InterTech has its principal place of business in North Charleston, South Carolina. InterTech is the corporate parent of Defendant PBI Performance Products, Inc.

46.    Defendant Milliken & Company ("Milliken") is a Delaware corporation that does business throughout the United States, including in California. Milliken has its principal place of business in Spartanburg, South Carolina.

47.    Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation that does business throughout the United States. PBI has its principal place of business in Charlotte, North Carolina. PBI is a wholly owned subsidiary of Defendant InterTech.

48.    Defendant Safety Components Fabric Technologies, Inc. ("Safety Components") is a Delaware corporation that does business throughout the United States, including in California. Safety Components has its principal place of business in Greenville, South Carolina. Safety Components is a subsidiary of Defendant Elevate Textiles.

49.    Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including in California. StedFast has its principal place of business in Piney Flats, Tennessee.

50.    Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("TenCate") is a Georgia corporation that does business throughout the United States, including in California. TenCate has its principal place of business in Senoia, Georgia.

*PFAS Turnout Gear Assembler Defendants*

51.    PFAS Turnout Gear Assembler Defendants assemble the final, finished Turnout Gear set that they then market, sell, distribute, and otherwise provide under their brand names to the County and proposed Class Members.

52.    PFAS Turnout Gear Assembler Defendants, perform multiple steps, such as to:  (a) source outer shells, moisture barriers, and thermal liners from the PFAS fabric producers; (b) cut, sew, laminate, and assemble the components; (c) apply additional treatments or finishes, including PFAS Chemical Finishes; brand and (d) certify the final Turnout Gear product to NFPA standards.

53.    Even though the outer shell, moisture barrier, and thermal liners already contain PFAS, the PFAS Turnout Gear Assembler Defendants apply additional PFAS Chemical Finishes after cutting and sewing.  For example, the PFAS Turnout Gear Assembler Defendants apply PFAS generally to the outer shell and reinforcements to enhance repellency and increase stain, oil, and chemical resistance.

54.    PFAS Turnout Gear Assembler Defendants add concentrated applications of PFAS Chemical Finishes, adhesives and seam tapes to seal moisture-barrier seams, reinforce stress points, bond reflective trim, bonding patches, labels and structural reinforcements, such as at the knees, elbows, cuffs, pockets, and reflective trim.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

55. PFAS Turnout Gear Assembler Defendants often apply PFAS-based repellency boosters and PFAS-based anti-static or anti-soiling sprays to the final, finished Turnout Gear. PFAS Turnout Gear assemblers also use PFAS-containing lubricants on sewing equipment.

56. PFAS glues, bonding agents, and lamination adhesives ("PFAS Adhesives") used during assembly increase the total PFAS load in the finished Turnout Gear.

57. PFAS adhesives contain fluorinated acrylic polymers, fluorotelomer-based surfactants, PFAS-modified urethanes and polytetrafluoroethylene ("PTFE") -filled adhesive film.

58. Defendant Fire-Dex LLC, ("Fire-Dex") is an Ohio Limited Liability Company that does business throughout the United States, including in California. Fire-Dex has its principal place of business in Medina, Ohio.

59. Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire limited liability company that does business throughout the United States, including in California. Globe's principal place of business is in Pittsfield, New Hampshire. Globe manufactures and assembles PPE with the PFAS Chemicals that are the subject of this Action.

60. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including in California. Honeywell has its principal place of business in Charlotte, North Carolina.

61. Defendant Innotex is a Canadian company that does business throughout the United States. Innotex has its principal place of business in Quebec, Canada and has a United States location in Ohatchee, Alabama. Innotex manufactures textiles with the PFAS Chemicals that are the subject of this Action.

62. Defendant Lion Group, Inc. ("Lion") is an Ohio corporation that does business throughout the United States, including in California. Lion's principal place of business is in Dayton, Ohio. Lion manufactures PPE with the PFAS Chemicals that are the subject of this Action.

63. Defendant Morning Pride Manufacturing L.L.C. ("Morning Pride") is a Delaware corporation that does business throughout the United States. Morning Pride has its principal place of business in Fort Mill, South Carolina. Morning Pride manufactures PPE with the PFAS Chemicals that are the subject of this Action. Plaintiff and Class Members have paid for PFAS Turnout Gear

designed, assembled, manufactured, marketed, and sold by one or more PFAS Turnout Gear Assembler Defendants.

64.    Plaintiff alleges that each named Defendant is in some manner responsible for the acts alleged herein, and that the Defendants proximately caused injuries to Plaintiff and Class Members, as alleged herein.

65.    Plaintiff alleges that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subject of this Action.  Defendants designed, developed, tested, manufactured, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals throughout the United States, including the State of California, and caused harm to Plaintiff and Class Members.

66.    Defendants expected or should have expected their actions to have consequences throughout the United States, including the State of California.

67.    Defendants purposefully availed themselves of the privilege of conducting activities in the State of California, thus invoking the benefits and protections of its laws.

### III.    JURISDICTION AND VENUE

68.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because it is a class action case in which the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and Class Members are citizens of a state different from each Defendant.

69.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because many of the actions giving rise to this Complaint took place within this District.

70.    Pursuant to Civil Local Rule 3-2, a substantial part of the events or omissions giving rise to the claims occurred in San Mateo County.  *See* Civil L.R. 3-2(c).  Thus, this civil action shall be assigned to the San Francisco Division or the Oakland Division.  *See* Civil L.R. 3-2(d).

71.    This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged herein throughout the State of California.  The conduct was directed at, or had the effect of, causing

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                          12

injury to persons residing in, located in, or doing business in the State of California.  In addition, the Court has personal jurisdiction over the Defendants because they directed their tortious conduct at persons and activities within the State of California.

## IV.    FACTUAL ALLEGATIONS

### A.    The History of PFAS, Turnout Gear, and the Major Effects of PFAS on the Environment and Human Health

72.    PFAS are a class of chemical compounds, which consist of chains of carbon and fluorine, that due to the strength of the carbon-fluorine bonds, are highly resistant to being broken down in nature.[12]

73.    PFAS do not exist naturally in the environment.  PFAS, which are formed by artificially connecting carbon and fluorine, are known for their strength, water resistance, grease protection, and stain resistance.

74.    In 1938, DuPont invented an early PFAS chemical that in the mid-1940s was coined as "Teflon."[13]  In the 1940s, DuPont and 3M produced PFAS on a commercial scale.  Since the 1940's and 1950's, PFAS have been widely used in industrial and consumer products.  The chemical stability, thermal stability, and water repellent characteristics of PFAS have led to their use in a wide range of products.  By 1948, DuPont was producing over 900 tons of PTFE per year.[14]  By the 1950s, DuPont and 3M commercialized PFAS chemicals into very lucrative performance chemicals.  PFAS

---

[12] *See* Nat'l Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, *available at* https://www.niehs.nih.gov/health/topics/agents/pfc.
[13] *See* Science History Institute Museum & Library, The Beckman Center for the History of Chemistry, Interviews with Roy J. Plunkett, Apr. 17 and May 27, 1986, *available at* https://digital.sciencehistory.org/works/0g354g32t#tab=ohDownloads;
Rudy Molinek, "The Long, Strange History of Teflon, the Indestructible Product Nothing Seems to Stick to," SMITHSONIAN MAGAZINE, Aug. 20, 2024, *available at* https://www.smithsonianmag.com/science-nature/the-long-strange-history-of-teflon-the-indestructible-product-nothing-seems-to-stick-to-180984920/.
[14] Bevin E. Blake & Suzanne E. Fenton, "Early Life Exposure to Per- and Polyfluoroalkyl Substances (PFAS) and Latent Health Outcomes:  A Review Including the Placenta as a Target Tissue and Possible Driver pf Peri- and Postnatal Effects," TOXICOLOGY (Aug. 2020) ("Blake, 'Early Life Exposure to PFAS'"), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0300483X20302043?via%3Dihub

have been used in a broad range of industrial and consumer products, including firefighter Turnout Gear.

75.     During the relevant time, Defendants DuPont and 3M collaborated in the creation, development, manufacture, and commercialization of PFAS molecules and performance chemistries, sharing research, development, critical data, investigative results, performance measures, reports, and other highly pertinent information related to the performance, impact, and safety of PFAS.

76.     Prior to Defendants DuPont and 3Ms' invention and commercialization of PFAS, PFAS had not been found in the environment or human body.

77.     In approximately 1966, Defendant Globe began manufacturing, marketing, and selling Turnout Gear containing PFAS.  Since about 1966, Globe has continued to manufacture, market, and sell Turnout Gear that contains PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, InterTech, PBI, and TenCate and PFAS manufactured by Defendants 3M and/or DuPont.

78.     In about 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

79.     In approximately 1970, Defendant Lion began manufacturing, marketing, and selling Turnout Gear containing PFAS.  Since about 1970, Lion has manufactured, marketed, and sold Turnout Gear containing PFAS, using PFAS manufactured by Defendants 3M and/or DuPont.

80.     For many decades, DuPont and 3M have known that PFAS caused serious health risks, but they long suppressed negative scientific research.  Moreover, DuPont and 3M funded and published research that concluded their PFAS products were safe.

81.     For example, in 1961, the DuPont Technology Chief found that Telon, in low doses, increased the liver size of laboratory animals.[15]

---

[15] *See* Dorothy B. Hood, Chief, Toxicology Section, Letter to Gerald J. Arenson, DuPont, Polychemicals Department, Research & Development Division, Experimental Station, "Toxicity of Teflon Dispersing Agents," Nov. 9, 1961, *available at* https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-20190910-SD009.pdf (study re: liver size of rats).

CLASS ACTION COMPLAINT                                                                                      14

82.    In 1970, a DuPont report showed that 3M C8, which was used in the preparation of Teflon dispersions, is "highly toxic when inhaled and moderately toxic."[16]

83.    In 1981, 3M informed DuPont that C-8 caused birth defects in laboratory animals.[17] In 1981, a confidential DuPont report identified birth defects in the children of female Teflon department employees, as well as C-8 PFAS in the children's blood.[18]

84.    In about 1983, Defendant Fire-Dex began manufacturing, marketing, and selling Turnout Gear that contains PFAS.  Since 1983, Fire-Dex has continued to manufacture, market, and sell Turnout Gear that contains PFAS, using PFAS-containing materials supplied by Defendants DuPont, Elevate Textiles, Gore, InterTech, Milliken, PBI, Safety Components, StedFast, and TenCate and PFAS manufactured by Defendants 3M and/or DuPont.

85.    PFAS's qualities—including the strong, artificially-connected carbon-fluorine bond—cause them to persist in the environment for long, if not indefinite, time periods.  Unlike many other environmental contaminants, PFAS chemicals are not metabolized by the body.  Because PFAS resist breakdown and are slowly excreted by the body, PFAS accumulate over time in human tissue – including in the blood, liver, and kidneys.

86.    In March 1999, 3M scientist Dr. Richard Purdy, resigned from 3M due to his ecological and health concerns about PFAS.[19]  In his resignation letter, Dr. Purdy expressed his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors."  Dr. Purdy explained, "Perfluorooctansefulfonate is the most insidious pollutant since PCB.  It is probably more damaging than PCB because *it does not degrade*, whereas PCB does; *it is more toxic to wildlife;*

---

[16] W.E. Hilton, DuPont, Fluorocarbons Division, "Request for Toxicological Information 'Teflon' Division Chemicals, Feb. 18, 1970, *available at* https://www.industrydocuments.ucsf.edu/docs/knpw0228/.
[17] R.D. Ingalls, DuPont, Energy and Environmental Affairs, Manufacturing Division, Memorandum, "C-8 Perfluorooctanoate," Apr. 6, 1981, *available at* https://www.industrydocuments.ucsf.edu/docs/kypw0228/.
[18] *See* DuPont Memorandum, "C-8 Blood Sampling Results," Apr. 1981, *available at* https://www.industrydocuments.ucsf.edu/docs/xnpw0228/
[19] *See* Richard Purdy, Resignation Letter to 3M (Mar. 28, 1999), *available at* https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf (emphasis added).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

*and its sink in the environment appears to be biota and not soil and sediment*, as is the case with PCB."

87.   In 2008, Defendant Honeywell acquired Norcross Safety Products LLC and began manufacturing, marketing, and selling Turnout Gear containing PFAS.  From 2008, Honeywell continued to manufacture, market, and sell Turnout Gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont, Gore, InterTech, Morning Pride, PBI, and StedFast and PFAS manufactured by Defendants 3M and/or DuPont.  On information and belief, in May 2025, Honeywell divested its PPE business to Protective Industrial Products, Inc.

88.   In recent decades, scientific researchers, environmentalists, and government agencies have raised concerns regarding the toxicity and persistence of PFAS.  Such concerns have prompted a major increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

89.   Current, peer-reviewed scientific research has cautioned that PFAS exposure is hazardous to human health.[20]  Studies have shown that exposure to PFAS can decrease immunity and increase risk of certain types of cancer, liver and kidney disease, and birth defects.

90.   PFAS exposure in humans can occur by dermal absorption, as well as by ingestion and inhalation.[21]  In addition, PFAS spread through humans by crossing the placenta from mother to fetus and by passing to infants through breast milk.[22]

91.   Moreover, when exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[23] thereby increasing the risk of PFAS exposure by dermal absorption, ingestion, and inhalation.

---

[20] *See* U.S. Environmental Protection Agency, "Our Current Understanding of the Human Health & Environmental Risks of PFAS," EPA.gov (updated Feb. 10, 2026) ("EPA, 'Our Current Understanding'"), *available at* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas ).
[21] *See* Andrew S. Hall, *et al.,* "Skin Permeability of Perfluorocarboxylic Acids Using Flow-Through Diffusion on Porcine Skin," TOXICS (Sept. 27, 2024), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC11511581/pdf/toxics-12-00703.pdf
[22] *See* Blake, "Early Life Exposure to PFAS."
[23] *See* Anna S. Young, *et al.,* "Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust," J. EXPOSURE SCI. & ENVIRON. EPIDEMIOLOGY 930–42 (2021), *available at* https://pubmed.ncbi.nlm.nih.gov/33542478/

92. PFAS exposure has been linked to a range of serious adverse health effects, including various cancers, tumors, liver damage, endocrine system disruption, immune system disorders, increased cholesterol levels, decreased fertility, and high-blood pressure in pregnant women.

93. PFAS have been found to concentrate in human blood, bones, the liver, kidney, lungs, and other organs.[24] Perfluorooctanoic acid ("PFOA") and PFOS bioaccumulate in humans' blood and organs, including the kidneys and liver. PFOA and PFOS impact the body's functions, including immune system, cardiovascular system, and the liver, leading to adverse health outcomes.

94. Even everyday use of PFAS-products lead to the emission of dangerous fumes. Exposing PFAS to high temperatures—such as the PFAS in a non-stick frying pan—can cause, among other things, the "Teflon Flu," whose symptoms can include a tight chest, wheezing, difficulty breathing, and headaches.

95. The routine exposure of firefighters' Turnout Gear to high heat in fire scenes, along with sunlight, breaks down the Turnout Gear, causing it to shed and release PFAS compounds.

96. In September 2022, the United States Environmental Protection Agency ("EPA") initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[25] In support, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

97. The EPA classified both PFOA and PFOS as likely human carcinogens.[26] In

---

[24] *See* Jose L. Domingo, "A Review of the Occurrence and Distribution of Per- and Polyfluoroalkyl Substances (PFAS) in Human Organs and Fetal Tissues," ENVIRONMENTAL RESEARCH (May 2025), *available at* https://www.sciencedirect.com/science/article/pii/S0013935125004323 .

[25] Environmental Protection Agency, Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 87 Fed. Reg. 54415 (Sept. 6, 2022), *available at* https://www.govinfo.gov/content/pkg/FR-2022-09-06/pdf/2022-18657.pdf

[26] *See, e.*g., U.S. Environmental Protection Agency, Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA) and Related Salts (Apr. 2024), *available at* https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfoa.pdf ; U.S. Environmental Protection Agency, "Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS) and Related Salts" (Apr. 2024), *available at* https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfos.pdf; U.S. Environmental Protection Agency, Human Health Toxicity Assessment for

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

addition, the EPA concluded that there is no safe level of PFOA or PFOS exposure to humans.

98.     In April 2024, the EPA announced the final National Primary Drinking Water Regulation ("NPDWR") to establish legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water.[27]   The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for those six PFAS.  Notably, the MCLGs for both PFOA and PFOS were listed as "Zero."

99.     The World Health Organization, International Agency for Research on Cancer ("IARC") has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.[28]

100.     In 2022, the California Office of Environmental Health Hazard Assessment ("OEHHA") listed PFOA as a chemical known to the state of California to cause cancer.[29]

101.     In 2023, the Yale School of Public Health conducted a PFAS study, in which two PFAS chemicals "spurred cancer cells in the lab to migrate to new positions," which was "an

Perfluorooctane Sulfonic Acid (PFOS), *available at* https://www.epa.gov/system/files/documents/2025-01/pfos-human-health-toxicity-assessment-infographic-factsheet.pdf ; U.S. Environmental Protection Agency, "Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA)" (Jan. 2025), *available at* https://www.epa.gov/system/files/documents/2025-01/pfoa-human-health-toxicity-assessment-infographic-factsheet.pdf

[27] *See* U.S. Environmental Protection Agency, "Per- and Polyfluoroalkyl Substances (PFAS)[:] Final PFAS National Primary Drinking Water Regulation," www.epa.gov, *available at* https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas .

[28] *See* World Health Organization, Int'l Agency for Research on Cancer, IARC MONOGRAPH: PERFLUOROOCTANOIC ACID (PFOA) AND PERFLUOROOCTANESULFONIC ACID (PFOS)[:]  IARC MONOGRAPHS ON THE IDENTIFICATION  OF CARCINOGENIC HAZARDS TO HUMANS, Vol. 135 (updated Mar. 2025), *available at* https://publications.iarc.who.int/636.  ; World Health Organization, Int'l Agency for Research on Cancer, *IARC Monographs evaluate the carcinogenicity of perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS)*, Dec. 1, 2023, *available at* https://www.iarc.who.int/news-events/iarc-monographs-evaluate-the-carcinogenicity-of-perfluorooctanoic-acid-pfoa-and-perfluorooctanesulfonic-acid-pfos/.

[29] *See* State of California, Cal. Environmental Protection Agency, "Notice to Interested Parties Chemical Listed Effective February 25, 2022 as Known to the State of California to Cause Cancer: Perfluorooctanoic Acid," (Feb. 25, 2022), *available at* https://oehha.ca.gov/sites/default/files/media/downloads/crnr/listingnoticepfoa022522.pdf.

CLASS ACTION COMPLAINT

LAW OFFICES COTCHETT, PITRE & McCARTHY, LLP

indication that the chemicals could contribute to cancer metastasis in living organisms."[30]   The Yale article further explained that PFAS "chemicals show up in the blood of newborns, of people living in sub-Arctic Indigenous communities, in fish and mussels, even birds' eggs."[31] "No level of PFAS in the body is considered safe, and they have been linked to a litany of health problems, including cancers."[32]

102.    Thus, the scientific community, the federal government, the World Health Organization, and the State of California have raised significant concerns about PFAS, due to their persistence, prevalence, and toxicity.

103.    Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the Turnout Gear that was laden with PFAS.

104.    Defendants 3M and Dupont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the County, Class Members, and their firefighters.

105.    Defendants 3M, DuPont, Elevate Textiles, Gore, InterTech, Milliken, PBI, Safety Components, StedFast, and TenCate expected their PFAS-containing materials to reach fire departments and firefighters without substantial change in the condition in which they were designed and manufactured, and they did so reach the County, Proposed Class Members, and their firefighters.

106.    Defendants Fire-Dex, Globe, Honeywell, Innotex, Lion, and Morning Pride expected their Turnout Gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the County, Proposed Class Members, and their firefighters.

---

[30] Jenny Blair, Yale School of Medicine, "Yale Study: 'Forever Chemicals' Promote Cancer Cell Migration:  New research evaluates the relationship between PFAS and colorectal carcinoma," Dec. 11, 2023, *available at* https://medicine.yale.edu/news-article/yale-study-forever-chemicals-promote-cancer-cell-migration/.
[31] *Id.*
[32] *Id.  See also* David Andrews, Ph.D., Environmental Working Group, *"FDA Studies: 'Short-chain' PFAS Chemicals More Toxic Than Previously Thought,'* Mar. 9, 2020, *available at* 'https://www.ewg.org/news-insights/news/fda-studies-short-chain-pfas-chemicals-more-toxic-previously-thought (FDA studies regarding 6:2 FTOH, which indicate that "human health risks of this important short-chain PFAS have been significantly underestimated.").

**CLASS ACTION COMPLAINT**                                                                 19

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**B.    Defendants' PFAS-Laden Turnout Gear Poses Serious Health and Environmental Risks**

107.    For numerous decades, Defendants have added PFAS to firefighters' Turnout Gear.

108.    PFAS Turnout Gear has particularly high concentrations of PFAS in the fluoropolymer moisture barriers, PFAS-based water and oil repellants, PFAS-laden aramid blends and aramid fabrics, and PFAS-containing adhesives and membranes.  PFAS Turnout Gear contains substantially higher concentrations of PFAS than any other comparable industrial, occupational, or consumer apparel, gear, and PPE.

109.    PFAS Turnout Gear is generally comprised of three layers:  (1) a durable, water-repellant outer shell, (2) a middle moisture barrier, and (3) an inner thermal liner, which is closest to the wearer's skin.[33]



*Source:  Peaslee study.*

110.    The primary purpose of the outer shell is to protect the firefighter from direct flame. The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and body heat to escape.  Liquid resistance and

---

[33] *See generally* Courtney Levin, "Know your gear: Understanding the layers of protection," FIRERESCUE1 (Sept. 6, 2022), *available at* https://www.firerescue1.com/fire-products/turnoutgear/articles/know-your-gear-understanding-the-layers-of-protection-q10J54biuyOvTkuc/.

**CLASS ACTION COMPLAINT**                                                                                20

vapor permeability are important for the prevention of steam burns, which can occur if water and heat get trapped inside the Turnout Gear. The primary purpose of the thermal liner is to protect the firefighter from ambient heat.

111. During the relevant time, Defendants DuPont and 3M collaborated in the creation, development, manufacture, and commercialization of PFAS molecules and performance chemistries, sharing research, development, critical data, investigative results, performance measures, reports, and other highly pertinent information related to the performance, impact, and safety of PFAS.

112. Defendants have added PFAS to PFAS Turnout Gear in high concentrations and to multiple layers. Indeed, PFAS Turnout Gear contains substantially higher concentrations of PFAS than other comparable industrial, occupational, or consumer apparel, gear, and PPE.

113. Moreover, PFAS concentrations in fluorinated polymer-treated textiles have been shown to increase with weathering.[34]

114. For decades, Defendants have added high concentrations of PFAS to firefighter Turnout Gear with the knowledge that PFAS are highly toxic and carcinogenic. In addition, Defendants have known and/or should have known that PFAS would not remain contained in the PFAS Turnout Gear; that the PFAS would leach into the skin of firefighters through transdermal absorption when worn; would off-gas into the air and be inhaled by firefighters and exposed persons; would abrade and crumble onto property and be inhaled or ingested by firefighters and other exposed persons; and would otherwise migrate and contaminate the surrounding environment and property.

115. PFAS-migration science research shows that PFAS do not remain bound within the Turnout Gear; instead, they continuously shed, volatilize, abrade, and leach from the Turnout Gear during normal use, storage, handling, and laundering.

116. In addition, newer, short-chain PFAS (four to six carbons) can degrade into persistent, hazardous PFAS compounds.

117. Once released, PFAS bind weakly to surfaces and readily contaminate station floors, gear rooms, apparatus bays, fabrics, drains, wastewater, dust, and soil.

[34] Maizel, "PFAS in New Firefighter Turnout Gear Textiles," *supra* n.4.

**CLASS ACTION COMPLAINT**

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

118.    Because PFAS are chemically stable, water-soluble, and highly mobile, even small releases accumulate over time, creating persistent contamination that spreads through HVAC systems, wash water, runoff, and porous building materials. This migration is inherent to the chemical properties of PFAS-treated textiles and fluoropolymer membranes, meaning contamination occurs without misuse, damage, or extraordinary conditions.

119.    PFAS are known immunotoxins and carcinogenic compounds that cause multiple harmful effects, including environmental and property contamination and a substantial risk of injury to the health and safety to humans and other animals.

120.    In recent decades, researchers, environmentalists, and government agencies have raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to be absorbed by, and accumulate in, the human body.

121.    Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

122.    Generally accepted peer-reviewed scientific research has found that PFAS exposure, even in minute quantities, is considered hazardous to human health, and is linked to multiple serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

123.    PFAS have been formally recognized as hazardous to the environment and human and animal health and safety by multiple U.S. and international organizations, including the EPA, Agency for Toxic Substances and Disease Registry, National Institute of Environmental Health Sciences, Environmental Counsil of the States, the European Environmental Agency, Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), and the National Institute of Standards and Technology ("NIST").

124.    PFAS exposure is considered hazardous to human health and is known to cause serious adverse health outcomes, which include, but are not limited to, various types of cancer, changes in bodily functions, reproductive harms, and developmental defects.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                 22

### C.    Firefighters' Exposure to PFAS

125.    At the 2022 International Association of Fire Fighters ("IAFF") Fallen Fire Fighter Memorial, *almost 75 percent* of the names added to the wall (348 out of 469) were members who had died from occupational cancer.  Furthermore, in 2025, *nearly 80 percent of IAFF member line-of-duty deaths* were due to occupational *cancer*.[35]

126.    There are established links between PFAS and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that firefighters contract more than the general public.

127.    A 2020 study conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), found significant quantities of PFAS in every layer of both new (*i.e.*, still in the original packaging) and used Turnout Gear collected from firefighters across the United States.[36]

128.    Lead researcher Graham Peaslee, a chemical physicist at the University of Notre Dame, commented that firefighter Turnout Gear contains "the most highly fluorinated textiles [he had] ever seen."[37] and that the levels of PFAS in the Turnout Gear means that the firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high . . . ."[38]

129.    In addition, the Peaslee study explained, "Startlingly, a garment-to-hand transfer of total fluorine . . . was also observed when researchers simply manipulated the textiles in our laboratory,"[39] which supports the premise that side-chain fluoropolymers and the PFAS they bind release to the environment upon wear.

130.    Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters with dermal absorption through direct contact between the firefighters' skin and PFAS Turnout Gear being a key exposure route.  Extensive scientific research

---

[35] Int'l Ass'n of Fire Fighters, "Fire Fighter Cancer Awareness Month," *available at* https://www.iaff.org/cancer-awareness-month/.

[36] Peaslee study, *supra* n. 6.

[37] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS,* CHEMICAL AND ENGINEERING NEWS (July 1, 2020), *available at* https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26.

[38] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear,* BLOOMBERG LAW (June 23, 2020), *available at* https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[39] Peaslee study, *supra*.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

and studies have demonstrated that firefighter exposure through dermal absorption, inhalation, and ingestion from the intended and expected use, cleaning, and storage of the gear presents a substantial risk of injury to the health and safety of the firefighters so exposed, including the risk of contracting cancer and other serious diseases.[40]

131.    Multiple biomonitoring studies show that firefighters often have substantially higher levels of certain PFAS in serum than the general population.[41]

132.    PFAS Turnout Gear is increasingly recognized as a potential source of PFAS exposure amongst firefighters.

133.    In 2021, the U.S. Congress responded to growing concerns that soaring rates of occupational cancers among firefighters may be directly caused by PFAS exposure from PFAS Turnout Gear by directing NIST to study the prevalence of PFAS in Turnout Gear.

134.    A pair of studies by NIST, released in May 2023 and January 2024, found that Turnout Gear not only contains cancer-causing PFAS but that the Turnout Gear releases even more PFAS when subject to simulated wear and tear.[42]

135.    In September 2024, the NFPA introduced NFPA 1970-2025, restricting the use of PFAS in Turnout Gear and requiring special testing and certification.

136.    In 2024, the states of Massachusetts and Connecticut passed laws (1) requiring notice beginning in 2025 to any person, local government, or state agency as to whether PFAS is contained in firefighter PPE being sold in either state; and (2) beginning on January 1, 2027, in Massachusetts, and in 2028, in Connecticut, banning the sale of any firefighter PPE containing PFAS.

137.    In August 2025, Illinois enacted the Deputy Chief Pete Bendinelli PFAS PPE Act—named for longtime Calumet City Firefighters Local 621 member Pete Bendinelli, who died from

---

[40] Mazumder, "Firefighters' Exposure to PFAS," *supra* n.2.

[41] Grace Campbell, *et al.*, *Replacing PFAS in Firefighter Turnout Gear*, UC BERKELEY (2022), *available at* https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf; National Institute of Standards, *Researchers Pin Down PFAS Prevalence in Firefighter Gear*, NIST (May 1, 2023), https://www.nist.gov/news-events/news/2023/05/researchers-pin-down-pfas-prevalence-firefighter-gear.

[42] B. Hayes, *Wear and Tear May Cause Firefighter Gear to Release More 'Forever Chemicals'*, NIST (Jan. 16, 2024), available at https://www.nist.gov/news-events/news/2024/01/wear-and-tear-may-cause-firefighter-gear-release-more-forever-chemicals.

LAW OFFICES
COTCHETT, PITRE & MCCARTHY, LLP

cancer in 2025—requiring notices of PFAS in Turnout Gear beginning in 2026 and prohibiting the manufacture, sale, and distribution of PFAS Turnout Gear beginning in 2027.

138.    Illinois Rep. Mike Kelly, who co-sponsored the newly enacted Illinois state law, explained: "Little did we know that the actual gear designed to protect us is actually killing us."

139.    In October 2025, the State of California passed AB 1181, which is directed towards the further study and replacement of PFAS Turnout Gear.  As Assemblymember Matt Haney, who sponsored AB 1181, explained, "Twenty years ago, heart disease was the leading threat to firefighter's health."  He further stated, "Today, cancer has replaced heart disease as the biggest killer of firefighters. . . . We have an obligation to ensure they are not exposed to cancer-causing chemicals from the very equipment designed to keep them safe."[43]

140.    In May 2024, the City of San Francisco passed an ordinance banning PFAS in Turnout Gear and requiring replacement by June 2026.  In December 2025, Mayor Daniel Lurie announced the purchase of 1,100 sets of non-PFAS Turnout Gear.  Mayor Lurie explained, "A safe San Francisco depends on the people who stand between danger and our residents.  When fire breaks out in our city, our firefighters run toward it.  Their equipment should defend them at every step of the way."[44]

141.    IAFF has affirmed the importance of laws such as those passed in Illinois, Connecticut, Massachusetts and California, stating in part that: "Reducing carcinogenic exposure from protective gear is a key part of the IAFF's ongoing mission to combat the cancer epidemic in the fire service."[45]

---

[43] Assemblymember Matt Haney, Release, "California Bill Removing Cancerous Chemicals from Firefighter Uniforms Passes out of the Legislature and Heads to Governor Newsom's Desk," Sept. 16, 2025, *available at* https://haney.asmdc.org/press-releases/20250916-california-bill-removing-cancerous-chemicals-firefighter-uniforms-passes.

[44] City of San Francisco, News "Mayor Lurie Announces San Francisco Fire Department Will Become Largest in U.S. to Adopt Safe Firefighting Gear," (Dec. 11, 2025), *available at* https://www.sf.gov/news-mayor-lurie-announces-san-francisco-fire-department-will-become-largest-in-us-to-adopt-safe-firefighting-gear.

[45] IAFF, News, "Illinois bans PFAS in fire fighter gear with new law," (Aug. 29, 2025), *available at* https://www.iaff.org/news/illinois-bans-pfas-in-fire-fighter-gear-with-new-law/

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

142.    The National Fallen Firefighters Foundation, International Association of Fire Chiefs, Volunteer and Combination Officers Section, and National Volunteer Fire Council have affirmed that occupational cancer is a serious threat to firefighters.

143.    NIST, IAFF, and U.S. Fire Administration warn that PFAS in Turnout Gear are potentially cancer-causing chemicals linked to cancer and other serious effects.[46]

144.    Firefighters, advocacy groups, unions, government agencies, and scientific bodies are aligned in identifying PFAS Turnout Gear as a significant PFAS exposure pathway and a catastrophic hazard to human health.

### D.    Defendants' Knowledge of PFAS Toxicity

145.    Although the general public is just beginning to discover the catastrophic impact of PFAS on the environment and human health, Defendants have known about the toxicity of PFAS for many decades.  Moreover, Defendants shared information amongst and between themselves while affirmatively misleading and actively concealing information from the public about the risks of PFAS exposure and their propensity to contaminate surrounding property.

146.    Defendants knowingly and intentionally added high concentrations of PFAS to Turnout Gear, despite that: (1) PFAS exposure has catastrophic health effects; (2) PFAS would migrate from the Turnout Gear and contaminate and harm surrounding property and persons; (3)  heat exposure to PFAS significantly increases the risk of toxic, volatile compounds being released into the air; (4) exposing PFAS concentrations and migration would increase with normal use and handling of the Turnout Gear and with exposure to the extreme stressors typically encountered as part of firefighting; (5) there was no safe way to use PFAS as a component in Turnout Gear; and (6) newer PFAS can degrade into persistent, hazardous, and mobile PFAS compounds.

---

[46] U.S. Fire Administration, *New Information on Potential Carcinogens in Firefighter Gear* (May 11, 2023), https://www.usfa.fema.gov/blog/carcinogens-in-firefighter-gear/?utm_source=copilot.com

**CLASS ACTION COMPLAINT**                                                                                26

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**1.      3M Has Long Known of the Dangers Caused by PFAS**

147.    Defendant 3M was the largest manufacturer of PFAS in the United States from approximately the 1940s through the early 2000s.

148.    3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

149.    As early as the 1950s, 3M performed studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. Defendant 3M discussed the findings of these studies internally and often shared them with DuPont, but it did not publicize or share the findings with the public or regulatory agencies.  For example:

    a.  In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

    b.  In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

    c.  By the 1970s, 3M had documented PFAS in fish, and it was aware that PFAS were hazardous to marine life.

    d.  In 1975, 3M learned that there was the "universal presence" of PFAS in human blood samples taken from across the United States.

    e.  In 1976, 3M began monitoring the blood of its employees for PFAS, because the company was concerned about potential health effects.

    f.  In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested.  3M documented that PFAS "should be regarded as toxic."

    g.  In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS.  The deaths were attributed to the "compound effect" of PFOS.

h.  In 1979, an internal 3M report discussing the studies on PFOA and PFOS states that PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."[47]

i.  In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

j.  In 1981, 3M moved twenty-five female employees "of childbearing potential" away from production lines at its Decatur, Alabama plant "[a]s a precautionary measure," based on internal research showing that PFAS were causing birth defects in rats.

k.  In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

l.  In 1989, a review of mortality data amount 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

150.  Section 8(e) of the Toxic Substances Control Act ("TSCA") required chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment."  TSCA § 8(e), 15 U.S.C. § 2607(e).  This reporting requirement has been included in the TSCA since its enactment in 1976.  *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

151.  Despite the decades of alarming data, 3M did not share its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA Section 8(e) letter to the EPA regarding PFOS.

---

[47] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show,* THE INTERCEPT (July 31, 2018).

**CLASS ACTION COMPLAINT**                                                                 28

152.    In 1998, the EPA learned that PFAS was in the blood of the general human population.  Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

153.    In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

154.    In 2022 and following a multi-year probe into both companies, the State of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties.  In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[48]

155.    In 2022, 3M reported to Maine that in 2021 and 2022, it had sold in the United States more than 20,000 products that contain PFAS, including Scotchlite reflective tape, which can be found on Turnout Gear.

### 2.    DuPont has Long Known of the Dangers of PFAS

156.    Prior to spinning off portions of the company into other entities, DuPont was, in terms of its sales, the largest chemical company in the world.

157.    DuPont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

158.    In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor who was worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[49]

159.    In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."

---

[48] CNN Business, *California sues 3M, DuPont over toxic 'forever chemicals',* (Nov. 10, 2022), *available at* https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.
[49] Sharon Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception,* THE INTERCEPT (Aug. 11, 2015).

**CLASS ACTION COMPLAINT**                                                                                           29

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

160.    As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. For example:

a. In 1961, a team of DuPont in-house researchers concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by DuPont in-house researchers had confirmed that PFOA was associated with the enlargement of various organs in rats.[50]

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

c. In 1970, DuPont explained, "Past studies made at Haskell Laboratories have indicated that ammonium perfluorooctonate (C-8 APFC), which is used in the preparation of 'Teflon'® dispersions, is highly toxic when inhaled and moderately toxic when injected."[51]

d. In 1978, DuPont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later in 1978, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

e. By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[52]

---

[50] *Id.*

[51] W.E. Hilton, DuPont, Fluorocarbons Division, "Request for Toxicological Information 'Teflon' Division Chemicals, Feb. 18, 1970, *available at* https://www.industrydocuments.ucsf.edu/docs/knpw0228/

[52] Sharon Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception,* THE INTERCEPT (Aug. 11, 2015).

**CLASS ACTION COMPLAINT**                                                                 30

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

f. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

g. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[53]

h. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

i. In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memorandum announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[54]

j. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.[55]

161. In June 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any

---

[53] *Id.*

[54] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare,* THE NEW YORK TIMES MAGAZINE (Jan. 6, 2016), *available at* https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[55] Sharon Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception,* THE INTERCEPT (Aug. 11, 2015).

**CLASS ACTION COMPLAINT**                                                                 31

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was "much longer" than animal studies showed.[56]

162.    In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

163.    In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that ***DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS.*** We must ***implement a strategy*** at the outset which ***discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further*** than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
>
> . . .
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[57]

164.    In 2005, the EPA reached a settlement with DuPont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and it further required DuPont to perform supplemental environmental projects worth $6.25 million.

---

[56] DuPont Memorandum, DuPont Haskell Laboratory Visit, Meeting Minutes (June 30, 2000), *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf

[57] Letter, P. Terrance Gaffney, Esq., Weinberg Group Inc. to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, re: Perfluorooctanoic acid (PFOA) (April 29, 2003), *available at* https://cdn.toxicdocs.org/QX/QXnogko6Eaqd8wNkE3Mj7rvRo/QXnogko6Eaqd8wNkE3Mj7rvRo.pdf (emphasis added).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

165. In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90 percent of its active litigation, to Defendant Chemours.

166. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

167. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont and 3M for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role—claiming it had never manufactured PFOA, PFOS, or firefighting foam—and maintain that California's claims were without merit: "We believe this complaint is without merit, and we look forward to vigorously defending our record of safety, health and environmental stewardship."[58]

168. Despite decades of covering up the dangers caused by PFAS, DuPont still asserts to the public that "safety" is at its "core." In a 2019 article, DuPont posits that its founder E.I. Du Pont —"[u]nlike typical leaders of business and industry of the era" —"cared deeply about safety." Moreover, at DuPont, "[b]y the 1920s, safety claimed the same status as other operational priorities: such as quality, productivity, and profitability." DuPont further maintains, "Yes, a lot has changed in the more than two centuries since our founding. But our legacy of safety and health lives on. And as our company transforms to meet the needs of a growing population, it will continue to be a core value at DuPont."[59]

---

[58] CNN Business, *California sues 3M, DuPont over toxic 'forever chemicals',* (Nov. 10, 2022), *available at* https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html

[59] DuPont, Article, "At our core: the historical origins of safety at DuPont," (May 22, 2019), *available at* https://www.dupont.com/news/safety-at-our-core.html

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

### 3.    The Remaining Defendants' Knowledge of the Dangers of PFAS

169.    The remaining Defendants and other participants in the supply chain for PFAS Turnout Gear also knew or should have known of the dangers of PFAS.  Despite decades of scientific research warning of major risks caused by PFAS, Defendants have misrepresented the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

170.    For example, in June 2020, Paul Chrostowski, Ph.D., a consultant hired by Defendant Lion, took out a page in the publication *Firefighter Nation*, arguing that PFAS Turnout Gear is completely safe and that evidence to the contrary, such as the Peaslee study, "create[s] unnecessary fear and misunderstanding."  Chrostowski argued:

> The evidence [] shows that ***firefighters are not exposed to PFAS at levels greater than control groups including the general population***.  So ***even if PFAS were found in their Turnout Gear***, at this time ***there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population.***
>
> . . .
>
> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in Turnout Gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.[60]

171.    In about 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants.  The City of Burlington pinpointed Defendant Elevate Textiles as "its largest source of PFAS."  Thereafter, a settlement agreement required Elevate Textiles to install a closed-loop system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in some of its products by June 15, 2025.[61]

---

[60] Paul Chrotowski, Lion Consultant, "Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims," Response to Fire Rescue Magazine Article, *Fire Fire Fighter Nation* (June 3, 2020), *available at* https://www.firefighternation.com/health-wellness/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/

[61] Lisa Org, "Burlington will curb PFAS discharges, per legal settlement with Haw River Assembly," NC NEWSLINE (Aug. 2, 2023), *available at*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

172. Likewise, Defendant Fire-Dex recently defended an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its Complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by firefighters and/or their spouses alleging bodily injuries due to PFAS exposure.

173. Defendant Gore advertises its "Materials Stewardship," that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]." But Gore has concealed the presence of PFAS in its products, misleading the public about the safety of its PFAS Turnout Gear materials.

174. Moreover, despite Gore's assertions about its stewardship, the State of Maryland filed suit against Gore, arising from decades of PFAS environmental contamination.

175. Defendant Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Minnesota law, which will take full effect in 2032, banning all non-essential uses of PFAS in eleven product categories.

176. In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

177. In or around 2021, Defendant StedFast spokesperson Mike Salvato presented on the topic of PFAS, PFOS, PFOA, and PTFE in Turnout Gear, acknowledging that "PFOS and PFOA have been found to be 'potentially harmful,'" but arguing that "[i]t is important to consider the trade-off of performance with perceived health risk if eliminating PFAS in gear." Salvato acknowledged that the "Peaslee study shows that turnout gear may 'shed' some PFAS" but argued "[o]rganizations should properly put into perspective the *assumed risk with PFAS* in turnout gear with other risks fire fighters face with the current materials available, PFAS is essential."[62]

---

https://ncnewsline.com/2023/08/02/burlington-will-curb-pfas-discharges-per-legal-settlement-with-haw-river-assembly/.

[62] *See* Mike Salvato, Stefast, Inc., Presentation: "PFAS, PFOA, PFOS, PTFE, and Your Turnout Gear," *available at* https://legacy-assets.eenews.net/open_files/assets/2021/02/16/document_gw_10.pdf.

**CLASS ACTION COMPLAINT**                                                                 35

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

178.    Facing increasing medical, environmental, governmental, and public concern regarding the dangers caused by PFAS exposure, Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or their denials—their awareness of the substantial injuries caused by PFAS.

179.    Moreover, in the early 2020s, as the toxic exposure risk to products containing PFAS became more generally known, Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from myriad consumer products, including textiles.  During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g., Johnson & Johnson and Oral-B), and textile manufacturing companies.

180.    In 2023, Defendant Globe's Chief Operating Officer "applaud[ed]" a New Hampshire bill titled the "PFAS Alternatives Act," and recognized "the demand for PFAS-free materials," stating that "Globe looks forward to continuing its long-term advocacy efforts . . . to promote this investment in innovation and pass the PFAS Alternatives Act."[63]

181.    Defendants knew or should have known that Turnout Gear containing PFAS posed a substantial risk of injury to the health and safety of Plaintiff and Class Members' firefighters, in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

182.    Defendants knew or should have known that exposure to PFAS-contaminated materials and/or PFAS places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

---

[63] Globe Manufacturing Company Supports Bipartisan PFAS Alternatives Act, PR NEWSWIRE (July 20, 2023), *available at* https://www.prnewswire.com/news-releases/globe-manufacturing-company-supports-bipartisan-pfas-alternatives-act-301882343.html#:~:text=Globe%20Manufacturing%20Company%20is%20a%20New%20Hampshire%2Dbased,industry%20meet%20firefighters'%20call%20for%20PFAS%2Dfree%20gear.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

183.   Defendants knew or should have known that the Turnout Gear either treated with and containing PFAS Chemicals or contained in the component parts of Turnout Gear that they manufactured, distributed, marketed, offered for sale, or sold would be used in ways in which Plaintiff and Class Members' firefighters would be exposed to the toxic properties of PFAS through dermal absorption, inhalation, and ingestion.

**E.   Defendants Conspired to Cover Up and Conceal PFAS Risks From the Public**

184.   Defendants knew that Turnout Gear containing PFAS was dangerous to Plaintiff and proposed Class Members' firefighters, in that it placed them at an increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants failed to disclose to Plaintiff, Class Members, or their firefighters the full extent of the health risks, and they failed to provide adequate warnings to Plaintiff, Class Members, and their firefighters regarding the substantial risk of injury to firefighters posed by PFAS contaminated Turnout Gear.

185.   Quite the opposite—Defendants continued to misrepresent the safety of Turnout Gear containing PFAS and engaged in campaigns – such as "greenwashing" – that were aimed to misinform and lessen public and regulatory concern regarding PFAS.

186.   For instance, the common purpose and conduct of Defendants 3M and DuPont to cover up the truth about PFAS and PFAS-laden products is shown by a 3M Material Safety Data Sheet that 3M had sent to DuPont in 1997.

187.   The United States has long sought to protect workers who have been exposed to hazardous chemicals in the work environment. In November 1983, the Occupational Safety and Health Administration ("OSHA") adopted the Hazard Communication Standard, which requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute. The Hazard Communication Standard requires information about hazards and protective measures to be disseminated on container labels and Material Safety Data Sheets ("MSDSs"). All employers with employees exposed to regulated chemicals must provide access to the labels and the MSDSs. Employers using the manufactured chemicals must also train employees to understand the

information provided by the MSDSs and the labels and how to use the information to protect themselves. The Hazard Communication Standard covers all chemicals in American workplaces.[64]

188. The February 1997 Material Safety Data Sheet that 3M sent to DuPont stated:

CANCER:
WARNING: Contains a chemical which can cause cancer. (3825-24-1) (1983 and 1993 studies conducted jointly by 3M and Dupont).[65]

189. Instead of informing the public of the dangers caused by PFAS, 3M and DuPont suppressed the February 1997 Material Safety Data Sheet as part of the wrongful conduct of the PFAS Cover-up Enterprise. Indeed, a former Minnesota Attorney General testified before a United States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution. In part, she testified about the 1997 Material Safety Data Sheet that 3M gave to DuPont.[66] After quoting from the document, she testified that "***3M removed the label*** that same year and ***for decades sold PFAS products without warning the public*** of its dangers."[67] While the former Attorney General's testimony concerned 3M, the same is true of DuPont, which associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

190. Nevertheless, Defendant Chemours has maintained and publicly advertised that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes

---

[64] "Hazard Communication in the 21st Century Workforce," Hearing Before the Subcommittee on Employment, Safety, and Training of the Committee on Health, Education, Labor, and Pensions, United States Senate (Mar. 25, 2004), *available at* https://www.govinfo.gov/content/pkg/CHRG-108shrg92926/html/CHRG-108shrg92926.htm.

[65] 3M, Specialty Chemicals Division, Material Safety Data Sheet, Feb. 7, 1997, *available at* https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf and https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1471.pdf

[66] Testimony of Lori Swanson, Former Minn. Attorney General, Before the Committee on Oversight and Reform, Sept. 10, 2019, *available at* https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf.

[67] *Id.* (emphasis added).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030."[68]

191.    In 2017, Defendant Lion's President wrote a letter to the Editor of *The Columbus Dispatch*, demanding the newspaper's retraction of a PFAS news story and denying that its Turnout Gear "posed any health risks to firefighters."[69]   Even so, Lion admitted that its manufacturing partners "used PFOA in their manufacturing process as a processing aid," so "it is possible that trace amounts may have been present in  Lion's turn-out gear."

192.    In approximately 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion Turnout Gear continues to be safe and ready for action especially when properly maintained.  It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[70]

193.    Moreover, in about 2021, Paul Chrostowski, Ph.D., the Lion consultant, created a presentation, "PFAS and LION Turnout Safety Gear,"[71] in which he asserted that PFAS "[l]evels in firefighters similar to general population and not linked to turnout gear."  Even so, Dr. Chrostowski acknowledged that in LION Turnout Gear, both "[o]lder samples detected PFOA (up to 23.5 ppb)," and that [n]ewer samples max PFOA was 0.96 ppb."

194.    In 2019, Defendant Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore components [Turnout Gear] are insignificant."

195.    Defendant Fire-Dex maintains and publicly advertises that its Turnout Gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] []

[68] Chemours, *Our Commitment to Responsible Chemistry, available at* https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship .

[69] Stephen A. Schwartz, President, Lion Group, Inc., Letter to Alan D. Miller, Editor, *The Columbus Dispatch* (Oct. 30, 2017), *available at* https://static.ewg.org/reports/2020/pfas-firefighter-timeline/2017_-_LION_letter.pdf?_ga=2.60849196.1253861871.164907068 - 2123137255.1639662520

[70] Lion, *Customer Safety Alert*:  PFOA *and Turnout Gear*, *available at* https://www.fireengineering.com/wp-content/uploads/2020/09/pfoa-lion.pdf

[71] Paul Chrostowski, Ph.D., QEP, Paul Chrowstowski LLC, Presentation:  "PFAS and LION Turnout Gear Safety," *available at* https://peer.org/wp-content/uploads/2021/07/document_gw_11.pdf

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

196.    Defendant Globe maintains and publicly advertises that the company is "committed to firefighter health & safety," and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

197.    In addition, in a *New York Times* article published in 2021, Gore maintained that its Turnout Gear products were safe.[72]

198.    In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

199.    Moreover, Defendants have repeatedly represented to Plaintiff, Class Members, their firefighters, and the public that their products were safe for their intended uses, including the ways in which Plaintiff, Class Members, and their firefighters were expected to use, clean, and store the Turnout Gear.    Meanwhile, Defendants' warning labels have not adequately disclosed the products' risks.    Rather, Defendants have repeatedly touted the safety of their products and firefighters' health.

200.    For example, Defendant DuPont maintained and publicly advertised that Turnout Gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

201.    In addition, MSA Safety, which is Defendant Globe's parent company, maintains and publicly advertises that the company is "committed to firefighter health & safety," and that:
> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our

---

[72] *See* Hiroko Tabuchi, *Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic*, N.Y. Times, Jan. 26, 2021 (updated Oct. 20, 2021), *available at* nytimes.com.

**CLASS ACTION COMPLAINT**                                                                40

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

mission remains unchanged: that men and women may work in safety and live in health.[73]

202.    Defendant Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

203.    Defendant Honeywell maintains and publicly advertises that the company's "safety solutions protect the future of 500 million workers" and that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

204.    Defendants have made broad statements promoting the safety of their products, while they have worked together for decades on Firefighter PPE that contains dangerous levels of toxic PFAS chemicals.

**F.    Defendants Failed to Provide Adequate Warnings of PFAS Risks**

205.    As alleged above, the PFAS Turnout Gear purchased and/or paid for by Plaintiff and Class Members did not contain appropriate labeling information or warnings:

    a.    Indicating that the gear contained or may contain PFAS.

    b.    Indicating that the gear specifically contained or may specifically contain PFOA or PFOS.

    c.    That heat exposure to PFAS significantly increases the risk of toxic compounds being released into the air.

    d.    That newer PFAS can degrade into persistent, hazardous PFAS compounds.

    e.    Regarding the health risks associated with exposure to PFAS.

    f.    Regarding the health risks associated with exposure to PFOA or PFOS.

    g.    Labels on Defendants' Turnout Gear did not adequately disclose that the Turnout Gear contained PFAS or PFAS-containing materials, and did not include adequate warnings that handling, wearing, or using the Turnout Gear as it was

---

[73] https://us.msasafety.com/firefighter-health?locale=en

**CLASS ACTION COMPLAINT**

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

intended to be handled, worn, cleaned, used or stored can result in exposure to PFAS and adverse effects to human health.

**G.      Defendants Had the Ability to Design Safer Turnout Gear**

206.    Despite Defendants' expressed position that PFAS were "essential" in Turnout Gear, at all relevant times, it was technologically and economically feasible to design and manufacture Turnout Gear that did not contain PFAS chemicals.

207.    In fact, Defendants had the knowledge and technical ability to design and manufacture PFAS-free chemicals and materials that could be incorporated into Turnout Gear to ensure that the Turnout Gear had appropriate durable water repellent and heat resistive characteristics.

208.    In or around 2021, Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[74]

209.    In or around 2021, PPE fabric manufacturer Fire-Dex, in conjunction with Milliken, as well as Honeywell announced the introduction PFAS-free material options for Turnout Gear.

210.    In Fall 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in Turnout Gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of firefighter Turnout Gear.[75]

211.    At least as of 2025, PFAS-free Turnout Gear was available in the marketplace that complied with the water-repellent and heat-resistant characteristics and for firefighter PPE, which are illustrated in applicable National Fire Protection Association ("NFPA") standards.

---

[74] Julia John, *WL Gore to release PFAS-free waterproof material for apparel,* ENHESA (Oct. 4, 2021).

[75] Grace Campbell, *et al.*, *Replacing PFAS in Firefighter Turnout Gear*, UC BERKELEY (2022), *available at* https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**H.    Defendants Failed to Disclose the Unfit Dangerous Nature of the Turnout Gear**

212.    During the relevant time period, Plaintiff and the Class Members, in the ordinary course, purchased, paid for, and/or otherwise provided Turnout Gear that contained PFAS chemicals and/or included textiles or component parts treated or contaminated with PFAS chemicals that Defendants manufactured, distributed, marketed, offered for sale, sold, and/or otherwise provided to Plaintiff and Class Members.

213.    At the time of purchase of such PFAS treated or contaminated Turnout Gear, Defendants did not adequately disclose or warn Plaintiff or the Class Members regarding the full extent of the PFAS treatment and/or contamination of the PPE; the full nature and extent of the substantial threat and risk of harm to the health and safety of firefighters, and others posed by the use, cleaning, and storing of the PFAS treated and/or contaminated Turnout Gear; and did not adequately disclose to Plaintiff and the Class Members that the Turnout Gear was not merchantable; was not fit for its intended use; was unreasonably dangerous to firefighters and others from its expected use, cleaning, and storing; and that the Turnout Gear should not be purchased or otherwise acquired by Plaintiff or the Class Members.

214.    Defendants misrepresented through public statements and concealment of information known to them that PFAS treatment or contamination of PPE did not render firefighter PPE unmerchantable, unfit, unsafe and/or unreasonably dangerous for its intended use, expected clearing, and storage.

215.    Defendants failed to inform Plaintiff and the Class Members of the inherent danger and substantial risk to health and safety posed by the PFAS treated and/or contaminated Turnout Gear, and of the risk of injury or harm to human health posed by the expected use, cleaning, and storage of the Turnout Gear.

216.    In acting as alleged in this Complaint, Defendants deprived Plaintiff and the Class Members of the information necessary for them to make informed business decisions regarding purchasing the Turnout Gear acquired during the relevant time period and to take the reasonable and necessary steps to protect Plaintiff, Class Members, their firefighters and others exposed to the danger posed by the Turnout Gear resulting from expected use, cleaning and storage.

## V.   CLASS ALLEGATIONS

217.   Plaintiff brings this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of itself and the following (the "Class"):

All political subdivisions of each of the States of the United States, including but not limited to, counties, cities, municipalities, fire districts, and other public or private entities in the United States that have purchased or paid for firefighter Turnout Gear that contained PFAS during the relevant time period that was treated or contaminated with PFAS resulting from Defendants' manufacturing, assembling, distribution, marketing, offering for sale, or sales activity.

Or in the alternative:

All political subdivisions of the State of California, including but not limited to, counties, cities, municipalities, fire districts, and other public or private entities in the State of California that have purchased or paid for firefighter Turnout Gear that contained PFAS during the relevant time period that was treated or contaminated with PFAS resulting from Defendants' manufacturing, assembling, distribution, marketing, offering for sale, or sales activity.

218.   Excluded from the foregoing class definitions are states themselves, including the State of California.

219.   Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any concerns of the Court.

220.   Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

221.   **Ascertainability.**  The proposed Class is readily ascertainable, because it is defined using objective criteria, thereby permitting Class Members to determine if they are part of the

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Class Members of the class can be identified readily through records and information in Defendants' possession, custody, or control.

222. **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. Although the exact number of members of the Class is not known to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of Class Members.

223. **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including but not limited to:

    a. Whether Defendants' conduct resulted in the availability of Turnout Gear in the marketplace that was unreasonably dangerous for its intended and expected use, handling, cleaning, and storage;

    b. Whether Defendants breached their duty to warn the members of the Class of, and protect the members of the Class from, the long-term health risks and consequences of exposure to the PFAS in their Turnout Gear;

    c. Whether members of the Class suffered the same or substantially similar injury or damage;

    d. Whether equity and law require that Defendants collectively share in the cost of the remedy, including: (1) the retrieval, removal, and proper disposal of PFAS-laden and/or contaminated Turnout Gear; and (2) providing each Class Member with sufficient funds to replace its contaminated Turnout Gear with PFAS-free Turnout Gear that meets the industry standards;

    e. Whether Defendants violated RICO, and

    f. Whether Defendants violated applicable state law.

224. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct as described herein. The injuries of Plaintiff and Class Members were directly caused by Defendants' wrongful conduct, and Plaintiff and Class Members assert similar claims for relief.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                    45

225. **Adequacy.** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel has any interest adverse to those of the other members of the Class.

226. **Substantial Benefits.** This class action is appropriate for certification, because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action is manageable. Plaintiff knows of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

### A.    Tolling and Estoppel of Applicable Statute of Limitations

227. For decades, Defendants had knowledge of the hazards to the health and safety of Plaintiffs, the Class Members, and their firefighters, and to their respective property, caused by exposure to PFAS.

228. By the 1960s and continuing for decades, Defendants conducted internal studies that demonstrated the toxicity of PFAS chemicals.  In addition, newer PFAS can degrade into persistent, hazardous PFAS compounds.

229. Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiff, Class Members, and their firefighters by designing, manufacturing, and selling Turnout Gear that was treated with PFAS.

230. Defendants intentionally concealed this information from Plaintiff, Class Members, their firefighters, and the public.

231. Defendants intentionally and continuously misrepresented the safety of the Turnout Gear treated with PFAS, PFAS-laden materials, and/or PFAS, assuring Plaintiff, Class Members, their firefighters, as well as the public and governmental authorities that the Turnout Gear treated with PFAS, PFAS-laden materials, and PFAS were safe.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                    46

232. At all relevant times, Defendants did not adequately disclose or warn Plaintiff and Class Members of the true nature of the dangers posed by PFAS-laden firefighter Turnout Gear.

233. Neither Plaintiff nor Class Members, through the exercise of reasonable care or due diligence, could have discovered the true nature of Defendants' products as alleged herein. Further, Plaintiff and Class Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

234. For these reasons, all applicable statutes of limitations have been tolled by the discovery rule with respect to claims asserted by Plaintiff and Class Members.

**B.    Fraudulent Concealment Tolling**

235. For decades, Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiff and Class Members.

236. Because of Defendants' active and ongoing concealment of the hazards of PFAS – as well as the unique dangers posed to firefighters through dermal absorption, ingestion, and inhalation of PFAS through off-gassing and migration – Plaintiff and the Class Members could not have reasonably discovered the causes of action alleged herein.

237. For this reason, applicable limitations on actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiff or Class Members should be tolled.

**VI.    CLAIMS FOR RELIEF**

**COUNT I**
**Violations of Racketeer Influenced and Corrupt Organizations Act (RICO)**
**18 U.S.C. § 1962(c), (d)**
**Individually and on behalf of the Class Against All Defendants**

238. Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

239. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

240. Pursuant to 18 U.S.C. § 1961(3), all Defendants are "persons," because they are "capable of holding a legal or beneficial interest in property."

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

241.    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Under 18 U.S.C. § 1962(d), it is unlawful for "any person to conspire to violate" 18 U.S.C. §§ 1962(a) through 1962(c).

242.    For numerous years, Defendants created and/or participated in the affairs of an illegal enterprise, whose purpose was to conceal the dangers caused by their PFAS products, including the PFAS-laden Turnout Gear.  As set forth below, the acts of Defendants in furtherance of the PFAS Cover-up Enterprise violate Sections 1962(c) and (d).

**A.    The Members of the PFAS Cover-up Enterprise**

243.    All of the Defendants were members of the PFAS Cover-up Enterprise.

244.    Concealment of the dangers of PFAS benefitted the enterprise in multiple ways. First, many Defendants, including 3M and the DuPont Defendants, make other products that contain PFAS.  To disclose the dangers of PFAS in Turnout Gear would have called into question the safety of other products that Defendants manufactured.  Second, the DuPont Defendants were facing increasing potential liability for environmental harm caused by the manufacture of PFAS. Therefore, Defendants were unwilling to tell the truth about the dangers of PFAS in Turnout Gear, so they could avoid disclosing the risks caused by their products.  Third, if Defendants had disclosed the dangers caused by PFAS in Turnout Gear, other firms would have competed much earlier to develop PFAS-free Turnout Gear.

245.    3M had substantial control over, and it participated in the affairs of the PFAS Cover-up Enterprise by:

    a.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS and PFAS-laden Turnout Gear to Plaintiff, members of the Class, their firefighters, and the public;

    b.    Concealing from government regulators the truth about the dangers of PFAS in PFAS-laden Turnout Gear;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

   c.  Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

   d.  Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-laden Turnout Gear.

246. The DuPont Defendants had substantial control over (and participated in) the affairs of the PFAS Cover-up Enterprise by:

   a.  Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS and PFAS-laden Turnout Gear to Plaintiff, members of the Class, their firefighters, and the public;

   b.  Concealing from government regulators the truth about the dangers of PFAS in PFAS-laden Turnout Gear;

   c.  Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

   d.  Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-laden Turnout Gear.

247. The PFAS Fabric Producer Defendants substantial control over (and participated in) the affairs of the PFAS Cover-up Enterprise by:

   a.  Manufacturing, distributing, and selling PFAS-laden fabric for Turnout Gear;

   b.  Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS-laden fabric and Turnout Gear to Plaintiff, members of the Class, their firefighters, and the public;

   c.  Introducing PFAS-laden fabric into the stream of U.S. commerce;

   d.  Concealing from government regulators the truth about the dangers of PFAS in PFAS-laden fabric and Turnout Gear;

   e.  Persisting in the manufacturing and distribution of PFAS-laden fabric despite knowing about their dangers; and

   f.  Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS-laden fabric and Turnout Gear .

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**      49

248. The PFAS Turnout Gear Assembler Defendants had substantial control over (and participated in) the affairs of the PFAS Cover-up Enterprise by:

    a. Manufacturing, distributing, and selling PFAS-laden Turnout Gear to fire departments and others;

    b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS-laden Turnout Gear to Plaintiff, members of the Class, and the public;

    c. Introducing PFAS-laden Turnout Gear into the stream of U.S. commerce;

    d. Concealing from government regulators the truth about the dangers of PFAS-laden Turnout Gear;

    e. Persisting in the manufacturing and distribution of PFAS-laden Turnout Gear despite knowing about their dangers; and

    f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS-laden Turnout Gear.

249. All members of the PFAS Cover-up Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in Defendants' and others' possession, custody, or control.

250. All members of the PFAS Cover-up Enterprise served the common purpose of concealing the dangers of PFAS-laden products from Plaintiff, Class Members, their firefighters, and the public. Each member of the PFAS Cover-up Enterprise shared the profits generated by the PFAS Cover-up Enterprise—i.e., by continuing to sell PFAS products for decades even though they knew that PFAS in those products posed serious dangers to human health and the environment.

251. In addition, 3M makes dozens of products that contain PFAS, and 3M faced billions of dollars in potential liabilities. As noted in its Fiscal Year 2024 SEC Form 10-K, its PFAS liability is substantial and was for years a liability 3M sought to concede:

> The Company has been voluntarily cooperating with various local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies in their reviews of the environmental and health effects of certain PFAS

produced by the Company. 3M currently is defending lawsuits concerning various PFAS-related products and chemistries, and is subject to unasserted and asserted claims and governmental regulatory proceedings and inquiries related to the production and use of PFAS in a variety of jurisdictions, as discussed in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements. 3M has seen increased public and private lawsuits being filed on behalf of states, counties, cities, and utilities alleging, among other things, harm to the general public and damages to natural resources, some of which are pending in the AFFF multi-district litigation and some of which are pending in other jurisdictions. Various factors or developments in these and other disclosed actions could result in future charges that could have a material adverse effect on 3M. For example, the Company recorded a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 with respect to the settlement of a matter brought by the State of Minnesota involving the presence of PFAS in the groundwater, surface water, fish or other aquatic life, and sediments in the state. In addition, as described in greater detail in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements, in June 2023, the Company entered into a class-action settlement ("PWS Settlement") to resolve a wide range of drinking water claims by public water suppliers in the United States regarding PFAS. The court approved that settlement in March 2024. 3M will pay $10.5 billion to $12.5 billion in total to resolve the claims released by the PWS Settlement, with payments to be made from 2024 through 2036, in exchange for a release of certain claims, as described further in Note 19. Unexpected events related to the PWS Settlement, including the potential impact of the PWS Settlement on other PFAS-related matters, could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position. In addition, as previously disclosed, in connection with the separation of Solventum, the Company agreed to retain liabilities related to PFAS for certain products sold by the Company's health care businesses prior to the separation and by Solventum for a limited period of time following the separation.

Governmental inquiries, lawsuits, or laws and regulations involving PFAS could lead to the Company incurring liability for damages or other costs, civil or criminal proceedings, the imposition of fines and penalties, or other remedies, including orders to conduct remediation, as well as restrictions on or added costs for business operations going forward, including in the form of restrictions on discharges at manufacturing facilities, requiring the installation of control technologies, suspension or shutdown of facility operations, switching costs in seeking alternative sources of supply, potential customer damage claims due to supply disruptions or otherwise, restoration of and/or compensation for damages to natural resources, personal injury and property damages, and reporting requirements or bans on PFAS and PFAS-containing products manufactured by the Company. The Company may also record asset retirement obligations, some of which may be material, depending in part on how the Company manages related assets in connection with these activities. Any of the foregoing could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

252.     Likewise, Globe in its parent company's Fiscal Year 2024 10-K is also facing substantial liabilities that it fought for years to concede:

> Globe, a subsidiary of the Company, is defending claims in which plaintiffs assert that certain products allegedly containing per- and polyfluoroalkyl substances ("PFAS") have caused harm, including injury or health issues. PFAS are a large class of substances that are widely used in everyday products.  Specifically, Globe builds firefighter Turnout Gear from technical fabrics sourced from a small pool of specialty textile manufacturers. These protective fabrics have been tested and certified to meet current National Fire Protection Association safety standards, and some of them as supplied to Globe contain or historically have contained PFAS to achieve performance characteristics such as water, oil, or chemical resistance.

> Globe believes it has valid defenses to these claims.  These matters are at a very early stage with numerous factual and legal issues to be resolved.  Defense costs relating to these lawsuits are recognized in the Consolidated Statements of Income as incurred.  Globe is also pursuing insurance coverage and indemnification related to the lawsuits. As of February 4, 2025, Globe was named as a defendant in approximately 663 lawsuits comprised of about 8,801 claims, predominantly styled as individual personal injury claims and including two putative class actions. Certain of these lawsuits include MSA Safety Inc. or other Globe affiliates as defendants

> MSA LLC is also a defendant in a number of PFAS lawsuits predominantly relating to Aqueous Film-Forming Foam. The Purchaser assumed responsibility for these and any similar future claims specific to MSA LLC, including such claims that have been or may be brought against MSA Safety Inc. or its subsidiaries, under the terms of the Purchase Agreement governing the Company's January 5, 2023, divestiture of MSA LLC. Further information about the transaction can be found in the Company's Current Report on Form 8-K filed on January 6, 2023.

### B.     RICO Predicate Acts

253.     In order to carry out or attempt to carry out the scheme to defraud, the members of the PFAS Cover-up Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

254.     Specifically, the members of the PFAS Cover-up Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

255.     The PFAS Cover-up Enterprise members' use of the mails and wires include, but are not limited to the transmission, delivery, or shipment of the following by the members or third parties

that were foreseeably caused to be sent as a result of the PFAS Cover-up Enterprise members' illegal scheme:

    a. PFAS products to fire departments and others;

    b. Documents and communications accompanying the shipments of PFAS products to fire departments and others;

    c. False or misleading Material Safety Data Sheets, Safety Data Sheets, Technical Data Sheets, and product labels;

    d. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of Turnout Gear products;

    e. Documents intended to facilitate the manufacture and sale of PFAS-laden Turnout Gear products, including invoices, shipping records, reports and correspondence;

    f. Documents to process and receive payment for PFAS-laden Turnout Gear, including invoices and receipts;

    g. Payments to the PFAS Cover-up Enterprise members for PFAS-laden Turnout Gear;

    h. Deposits of proceeds from sales of PFAS-laden Turnout Gear by PFAS Cover-up Enterprise members; and

    i. Other documents and things, including electronic communications.

256. The PFAS Cover-up Enterprise members utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

257. The PFAS Cover-up Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

258. The mail and wire transmissions described herein were made in furtherance of the PFAS Cover-up Enterprise members' scheme and common course of conduct in order to deceive

regulators and consumers and to lure and effectuate the purchase of products that the PFAS Cover-up Enterprise members knew emit PFAS.

259. Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the PFAS Cover-up Enterprise members' books and records. But Plaintiff has described the types thereof, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include numerous communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

260. The PFAS Cover-up Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Cover-up Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the PFAS Cover-up Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the PFAS Cover-up Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

261. The PFAS Cover-up Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

262. To achieve their common goals, the PFAS Cover-up Enterprise members hid from the general public, fire departments, and others the dangers of PFAS.

263. The PFAS Cover-up Enterprise members, with knowledge and intent, have agreed to the overall objectives of the PFAS Cover-up Enterprise and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling PFAS-laden products.

264. The PFAS Cover-up Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiff and the Class Members were harmed as a result of the PFAS Cover-up

Enterprise members' intentional conduct.  Plaintiff, the Class Members, regulators, and consumers, among others, relied on the PFAS Cover-up Enterprise members material misrepresentations and omissions.

265.    As described herein, the PFAS Cover-up Enterprise members engaged in a pattern of related and continuous predicate acts for numerous years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and other Class Members and obtaining significant monies and revenues from them and through them while providing PFAS-laden products.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

266.    The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Cover-up Enterprise members at the expense of Plaintiff, the Class Members, and consumers. The predicate acts were committed or caused to be committed by the PFAS Cover-up Enterprise members through their participation in the PFAS Cover-up Enterprise and in furtherance of its fraudulent scheme.

267.    The PFAS Cover-up Enterprise members had a duty to disclose the truth about the dangers of PFAS-laden products to Plaintiff, Class Members, consumers, and others but they failed to do so.  The Hazard Communication Standard requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets (SDSs) (formerly Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards.[76] The information contained in the SDS is largely the same as the Material Safety Data Sheets, except now the SDSs are required to be presented in a consistent user-friendly, 16-section format.[77]

268.    On information and belief, Plaintiff alleges that the PFAS Cover-up Enterprise members never disclosed the dangers of PFAS in PFAS-laden products in SDSs and Material Safety Data Sheets for PFAS-laden products that they sold.

---

[76] The Standard was first adopted in 1983 in the United States with limited scope (48 FR 53280; November 25, 1983). In 1987, it was expanded to cover all industries where employees are potentially exposed to hazardous chemicals (52 FR 31852; August 24, 1987).
[77] https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf.

**CLASS ACTION COMPLAINT**                                                                                  55

269. The PFAS Cover-up Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and Class Members, all of whom are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each member of the PFAS Cover-up Enterprise knew, understood, and intended for municipal entities, fire departments, and others to purchase, pay for, and otherwise provide PFAS-laden Turnout Gear sold and/or paid for by Plaintiff and Class Members, knowing that the PFAS emitted by Turnout Gear would injure Plaintiff, Class Members, and their firefighters. As a result of the conduct of the Enterprise, Plaintiff and Class Members overpaid for Turnout Gear and/or were deprived of the ability to buy PFAS-free Turnout Gear.

**COUNT II**
**Common Law Conspiracy**
**Individually and on behalf of the Class Against All Defendants**

270. Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

271. Defendants, which knew that PFAS chemicals posed serious health risks, conspired to misrepresent the safety of PFAS and PFAS-products, including PFAS Turnout Gear. Moreover, Defendants suppressed negative scientific research regarding PFAS.

272. Through a common conspiracy, Defendants manufactured, marketed, distributed, sold, and otherwise supplied PFAS and PFAS-products, including PFAS Turnout Gear, to Plaintiff, Class Members and the public without disclosing the toxicity of their products.

273. Plaintiff alleges on information and belief that Defendants knowingly and intentionally conspired to engage in the wrongful conduct under the applicable state law.

**COUNT III**
**Strict Product Liability (Design Defect)**
**Individually and on behalf of the Class Against All Defendants**

274. Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

275. Defendants have defectively designed their products, including in violation of the following state's laws: Alabama Extended Manufacturer's Liability Doctrine, Alaska, Arizona, Arkansas, California, Colorado, Connecticut Product Liability Act, Conn. Gen. Stat. 52-572m *et*

*seq.,* Delaware, Hawaii, Illinois, Indiana Products Liability Act, Ind. Code Ann. § 34-20-1-1 *et seq.*, Iowa, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New York, New Jersey, North Carolina, Oklahoma, Or. Rev. Stat. Ann. § 30.900 *et seq.*, Pennsylvania, South Carolina, South Dakota, Tennessee Products Liability Act, Tenn. Code Ann. 29-28-101 *et seq.,* Tex. Civ. Practice and Remedies Code, Ch. 82, Utah Product Liability Act, Utah Code Ann. § 78B-6-701 *et seq.,* Washington Product Liability Act, Wash. Rev. Cod Ann. § 7.72.010 *et seq.*, Wisconsin Stat. Ann. § 895.047, West Virginia, and Wyoming. At all relevant times, Defendants were engaged in the business of selling PFAS molecules, PFAS Chemical Finishes, and PFAS Turnout Gear.

276. At all relevant times, Defendants manufactured, sold, and distributed to Plaintiff and members of the Class Members, including to their firefighters, unreasonably dangerous PFAS Turnout Gear.

277. Defendants PFAS Turnout Gear is defective because the addition of toxic PFAS renders the PFAS Turnout Gear inherently and unreasonably dangerous so that its mere presence causes a serious health risk to firefighters and other exposed persons.

278. PFAS Turnout Gear is unreasonably dangerous and it fails to perform as safely as an ordinary user would expect and its risks far outweigh any utility.

279. Defendants had a duty not to place into the stream of commerce unreasonably dangerous products, and they owed that duty to all persons, including the Plaintiff and Class Members, who might be foreseeably harmed by PFAS Turnout Gear.

280. PFAS Turnout Gear is unreasonably dangerous for its foreseeable uses and misuses because it contains highly toxic PFAS which migrate and contaminate the surrounding environment, property, firefighters and other exposed persons, as set forth herein.

281. Firefighting activities involve exposure to extreme stressors that are known to result in increased concentrations of PFAS, as well as accelerated migration and contamination.

282. Defendants designed and manufacture PFAS Turnout Gear to include high concentrations of toxic PFAS in the essential structural components, as well as additional PFAS added through finishing sprays, adhesives, and reinforcements. The concentration of PFAS in Turnout Gear is far higher than in other occupational gear.

283. Defendants added PFAS to PFAS Turnout Gear in high concentrations and to components of the Turnout Gear ensemble that they knew or should have known would have high exposure to extreme stressors that volatize PFAS and accelerate their concentration and migration out of the PFAS Turnout Gear causing unreasonably dangerous toxic contamination of surrounding property and persons.

284. PFAS Turnout Gear was in a defective condition that made it unreasonably dangerous when it left Defendants' control.

285. All Defendants contributed to the defective condition of the PFAS Turnout Gear and had knowledge of its existence at the time it left their control.

286. All Defendants are responsible for the defective condition of the PFAS Turnout Gear purchased by Plaintiff and the Class Members.

287. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Member Property. Plaintiff and the Class Members suffered physical injuries as alleged more fully herein, including physical injury in the form of toxic contamination of their property and harmful and dangerous exposure of their firefighters and other exposed persons to catastrophic harms to health such as cancer.

**COUNT IV**
**Strict Product Liability (Failure to Warn)**
**Individually and on behalf of the Class Against All Defendants**

288. Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

289. Defendants have failed to warn, including in violation of the following state's laws: Alabama Extended Manufacturer's Liability Doctrine, Alaska, Arizona, Arkansas, California, Colorado, Connecticut Product Liability Act, Conn. Gen. Stat. 52-572m *et seq.,* Delaware, Hawaii, Illinois, Indiana Products Liability Act, Ind. Code Ann. §§ 34-20-1-1 *et seq*., Iowa, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New York, New Jersey, North Carolina, Oklahoma, Or. Rev. Stat. Ann. § 30.900 *et seq*., Pennsylvania, South Carolina, South Dakota, Tennessee Products Liability Act, Tenn. Code Ann. 29-28-101 *et seq.,* Tex. Civ. Practice and Remedies Code, Ch. 82, Utah Product Liability Act, Utah Code Ann. § 78B-6-701 *et seq.,* Washington Product

Liability Act, Wash. Rev. Cod Ann. § 7.72.010 *et seq*., Wisconsin Stat. Ann. § 895.047, West Virginia, and Wyoming.

290.    At all relevant times, Defendants were engaged in the business of manufacturing, marketing, selling, and distributing PFAS, PFAS Turnout Gear, and/or other PFAS-products.

291.    As manufacturers, distributors, or sellers of PFAS and other PFAS-products, Defendants had a duty to adequately warn against latent dangers from reasonably foreseeable uses and misuses of their products. Defendants' duty to warn extended to third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including  Plaintiff and the Class Members, as well as to firefighters, entities providing Turnout Gear cleaning, transport, and storage services, firefighter unions, government regulators, all entities involved in the PFAS Turnout Gear supply chain and the general public.

292.    Defendants had a duty to disclose the addition of PFAS to their PFAS Turnout Gear, the migration of PFAS out of PFAS Turnout Gear, PFAS contamination of the surrounding environment, property and persons, and the known risks of PFAS exposure and unreasonable dangerous hazards to human health.

293.    Defendants had superior knowledge of the PFAS contained in their PFAS Turnout Gear, including those contained in their PFAS Chemical Finishes, other structural components and finishing additives.  Moreover, Defendants had a superior knowledge of the toxicity and risks of PFAS, as well as the risks associated with it use by Plaintiff and Class Members.

294.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS and PFAS-laden products, Defendants failed to warn the public and Class Members of those risks.

295.    Any warnings that Defendants may have disseminated were rendered ineffective by their  broad, long-standing efforts to cover up the dangers caused by PFAS; and their false, misleading statements to the public about PFAS and their PFAS-laden products.

296.     Defendants' inadequate warnings and instructions rendered PFAS-laden products defective and unreasonably dangerous.

297.    Any warnings that Defendants may have disseminated were rendered ineffective by their false and misleading public statements about the existence of PFAS in their Turnout Gear,

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

dangers of PFAS, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

298.   PFAS-laden products were defective because of their inadequate warnings regarding PFAS risks, and Defendants' PFAS-laden products reached Plaintiff, Class Members, and their other end users without substantial change in condition.

299.   Defendants' failure to warn proximately caused harm to Plaintiff and the Class Members, who would have heeded legally sufficient warnings about the dangers of PFAS in PFAS Turnout Gear.

300.   At all relevant times, Plaintiff and Class Members, including their firefighters, used their PFAS Turnout Gear as intended.

301.   Defendants' actions proximately caused harm (e.g., property damage, personal injury to their firefighters) to Plaintiff and Class Members.

## COUNT V
**Fraudulent Misrepresentation/Concealment and Negligent Misrepresentation
Individually and on behalf of the Class Against All Defendants**

302.   Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

303.   Defendants have engaged in fraud and deceit, including as set forth under California Civil Code §§ 1710 and 3294.

304.   Defendants made false statements of material fact and concealed material facts when they had a duty to speak.

305.   Defendants represented that the PFAS Turnout Gear was safe and suitable for use by firefighters and/or concealed the fact that the PFAS Turnout Gear contained dangerous PFAS that could contaminate property.

306.   Defendants knew or believed its statements to be false or knew that it was concealing material facts.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                                     60

307.    Defendants knew or should have known about the dangers of PFAS in their PFAS Turnout Gear and the unreasonably dangerous risks to human health caused by PFAS migration and contamination.

308.    Defendants made these representations and/or concealed these facts to induce Plaintiff and the Class to purchase and/or pay for the PFAS Turnout Gear.

309.    Plaintiff and Class Members acted in reliance on the truth of Defendants' statements or the assumption that no material facts were concealed.

310.    Plaintiff and Class Members paid for, and their firefighters used the PFAS Turnout Gear based on Defendants' representations about its safety and suitability and/or the absence of warnings about the existence of PFAS in the PFAS Turnout Gear, migration of PFAS out of the PFAS Turnout Gear, PFAS contamination of surrounding environment, property, and persons, unreasonably dangerous risks to human health caused by PFAS contamination and exposure.

311.    Plaintiff and Class Members suffered damage as a result of its reliance.

312.    As a result of Plaintiff and Class Members' reliance on defendant's misrepresentations and/or concealment, Plaintiff and Class Members' property was contaminated with PFAS, causing Plaintiff and Class Members to incur costs for property damage remediation and replacement of the contaminated Turnout Gear.

313.    Plaintiffs and the Class Members' firefighters suffered property harm and physical injuries herein, including property contamination due to PFAS and dangerous exposure of the firefighters and other exposed persons to catastrophic harms to health such as cancer.  The PFAS exposure warrants remedies including medical monitoring.

**COUNT VI**
**Breach of Express Warranty of Merchantability**
**Individually and on Behalf of the Class Against All Defendants**

314.    Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

315. Defendants warranted to Plaintiff, Class Members, and their firefighters through written statements and advertisements that the PFAS and PFAS-products, including PFAS Turnout Gear, would work safely.

316. The Turnout Gear that is the subject of this action was treated and/or contaminated with unreasonably safe PFAS, rendering the Turnout Gear not merchantable or fit for the ordinary purposes for which Turnout Gear is used.

317. The PFAS treated and/or contaminated Turnout Gear was not suitable for use and posed a substantial risk of injury to the health and safety of firefighters and others exposed to the hazards of PFAS from the intended and expected use, cleaning, and storage of the Turnout Gear.

318. At the time of the transaction at issue, the Defendants had reason to know of the general and particular requirements and needs of the Plaintiff and Class Members regarding the Turnout Gear and that the harm resulting from Defendants' conduct as alleged could not reasonably have been prevented by Plaintiff and Class Members.

319. As a consequence of the Defendants' conduct as alleged, in order for the Plaintiff and Class Members to remedy the harm caused by Defendants' conduct as alleged it will be necessary for Plaintiff and Class Members to expend the resources necessary to: (1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and (2) outfit each of the Plaintiff and Class Members' firefighters with two sets of suitable Turnout Gear that has not been treated or contaminated with PFAS compounds.

320. As a consequence of the Defendants' conduct as alleged herein, Plaintiff and Class Members have been wrongfully deprived of funds that were budgeted and expended to purchase suitable Turnout Gear and have added financial and legal burdens regarding the proper removal and disposal of the PFAS treated and/or contaminated Turnout Gear at issue and outfitting each of the respective parties' firefighters with two sets of Turnout Gear that is not treated or contaminated with PFAS compounds.

321. Under the applicable state law, Defendants have breached their express warranties. *See, e.g.*, California Civil Code § 1791.2.

## COUNT VII
### Breach of Implied Warranty of Merchantability
### Individually and on Behalf of the Class Against All Defendants

322. Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

323. The Turnout Gear that is the subject of this action was accompanied by Defendants' implied warranty of merchantability.

324. The Turnout Gear that is the subject of this action was treated and/or contaminated with unreasonably safe PFAS, rendering the Turnout Gear not merchantable or fit for the ordinary purposes for which Turnout Gear is used.

325. The PFAS treated and/or contaminated Turnout Gear was not suitable for use and posed a substantial risk of injury to the health and safety of firefighters and others exposed to the hazards of PFAS from the intended and expected use, cleaning, and storage of the Turnout Gear.

326. At the time of the transaction at issue, the Defendants had reason to know of the general and particular requirements and needs of the Plaintiff and Class Members regarding the Turnout Gear and that the harm resulting from Defendants' conduct as alleged could not reasonably have been prevented by Plaintiff and Class Members.

327. As a consequence of the Defendants' conduct as alleged, in order for the Plaintiff and Class Members to remedy the harm caused by Defendants' conduct as alleged it will be necessary for Plaintiff and Class Members to expend the resources necessary to: (1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and (2) outfit each of the Plaintiff and Class Members' firefighters with two sets of suitable Turnout Gear that has not been treated or contaminated with PFAS compounds.

328. As a consequence of the Defendants' conduct as alleged herein, Plaintiff and Class Members have been wrongfully deprived of funds that were budgeted and expended to purchase suitable Turnout Gear and have added financial and legal burdens regarding the proper removal and disposal of the PFAS treated and/or contaminated Turnout Gear at issue and outfitting each of the

respective parties' firefighters with two sets of Turnout Gear that is not treated or contaminated with PFAS compounds.

329.    Under the applicable state law, Defendants have breached the implied warranty of merchantability. *See, e.g.*, California Civil Code § 1791.1.

330.    In addition, with respect to Massachusetts Class Members, under Massachusetts law, design defect claims are brought under the breach of the implied warranty of merchantability.

a.    At all relevant times, Defendants were in the business of manufacturing, selling and/or distributing PFAS and/or PFAS-laden products.

b.    As manufacturers, sellers or distributors of PFAS and/or PFAS-laden products, Defendants had a duty not to place into the stream of commerce unreasonably dangerous products, and they owed that duty to all persons, including the Massachusetts Class Members, who might be foreseeably harmed by PFAS-laden products.

c.    Defendants' PFAS-laden products are unreasonably dangerous for their foreseeable uses because, *inter alia*: PFAS cause extensive and long-term contamination of the environment, even when used in their foreseeable and intended manner; PFAS contamination poses significant threats to the environment, economic welfare, and public health; Defendants failed to disclose these risks to fire departments, Massachusetts Class Members and the public . Instead, Defendants downplayed the dangers caused by their PFAS products and made misleading assurances that PFAS Turnout Gear was safe.

d.    At all relevant times, Defendants' PFAS Turnout Gear was in a defective condition, and it was unreasonably dangerous to the Massachusetts Class Members, as it posed a risk of harm beyond that which an reasonable consumer would expect when using it in a foreseeable manner.

e.    At all relevant times, Massachusetts Class Members and their firefighters used Turnout Gear that contained PFAS as intended.

f. Defendants knew of the risks posed by PFAS, and they failed to use reasonable care in the design of their PFAS-laden products. Moreover, Defendants could have made products that did not contain PFAS or could have designed their PFAS-laden products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt reasonable, feasible, safer designs rendered their products defective and unreasonably dangerous.

g. At all relevant times, the risks of harm to public health, property, and the environment posed by Defendants' PFAS-laden products outweighed the utility of using PFAS in those products.

h. Defendants' PFAS-laden products were defectively designed when they left Defendants' control; and Defendants' products reached their end users without substantial change in condition.

i. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-laden products, Massachusetts Class Members have been harmed (e.g., personal injury and/or property damage).

331. In addition, under Massachusetts law, failure to warn claims are brought as breach of the implied warranty of merchantability.

a. As manufacturers, distributors, or sellers of PFAS and/or PFAS-laden products, Defendants had a duty to adequately warn against latent dangers from reasonably foreseeable uses and misuses of their products. Defendants' duty to warn extended to third parties who might be foreseeably harmed by the ordinary use of their products, including Massachusetts Class Members, as well as to all Turnout Gear manufacturers that treated their Turnout Gear with PFAS or PFAS-laden products before selling them to Massachusetts Class Members.

b. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS and PFAS-laden products, Defendants failed to warn the public and Massachusetts Class Members of those risks.

c. Any warnings that Defendants may have disseminated were rendered ineffective by their broad, long-standing efforts to cover up the dangers caused by PFAS; and their false, misleading statements to the public about PFAS and their PFAS-laden products.

d. Defendants' inadequate warnings and instructions rendered PFAS-laden products defective and unreasonably dangerous.

e. Defendants' PFAS-laden products were defective because of their inadequate warnings regarding PFAS risks, and Defendants' PFAS-laden products reached their end user without substantial change in condition.

f. Defendants' failure to warn proximately caused harm to Massachusetts Class Members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Massachusetts Class Members and their firefighters used their PFAS Turnout Gear as intended.

g. Defendants' actions proximately caused harm (e.g., personal injury, property damage) to Massachusetts Class Members.

## COUNT VIII
### Breach of Warranty:  Fitness for Particular Purpose
### Individually and on Behalf of the Class Against All Defendants

332.   Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

333.   The Turnout Gear that is the subject of this action was treated and/or contaminated with PFAS, rendering the Turnout Gear not fit for the particular purpose for which such PPE is used and posed a substantial risk of injury to the health and safety of firefighters and others exposed to the hazards of PFAS from the intended and expected use, cleaning, and storage of the Turnout Gear.

334.   At the time of the transaction at issue, the Defendants had reason to know of the particular purpose for which the Turnout Gear was required and that Plaintiff and Class Members were relying on Defendants' skill, judgment, and particular knowledge regarding the goods at issue. In addition, Defendants at the time of the transaction at issue, knew of the harm to Plaintiff and Class Members that likely would result from Defendants' conduct as alleged herein.

335.    As a consequence of the Defendants' conduct as alleged herein, in order for the Plaintiff and Class Members to remedy the harm caused by Defendants' conduct as alleged herein it will be necessary for Plaintiff and the Class Members to expend the resources necessary to: (1) properly remove and dispose of the PFAS treated or contaminated Turnout Gear; and (2) outfit each of the Plaintiff and Class Members' firefighters with two sets of suitable Turnout Gear that has not been treated or contaminated with PFAS compounds.

336.    As a consequence of the Defendants' conduct as alleged, the Plaintiff and Class Members have been wrongly deprived of funds that were budgeted and expended to purchase suitable firefighter PPE and have added financial and legal burdens regarding the proper removal and disposal of the PFAS treated and/or contaminated firefighter PPE at issue and outfitting each of the respective parties' fire fighters with two sets of Turnout Gear that are not treated and/or contaminated with PFAS compounds.

## COUNT IX
### Negligence
### Individually and on Behalf of the Class Against All Defendants

337.    Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

338.    Each Defendant had a duty of reasonable care to avoid manufacturing and selling Turnout Gear and/or components of Turnout Gear that were contaminated with detectable, unsafe levels of PFAS to its customers and end users, which include Plaintiff, Class Members, and their firefighters.  Defendants had the duty to reasonably test, research, and inspect their products – including the safety of the PFAS chemicals – to avoid the foreseeable risks of injury.  For decades, Defendants knew that PFAS posed serious risks of harm to the environment and the public. Nevertheless, Defendants continued to incorporate PFAS into Turnout Gear and the Turnout Grear components.  During all relevant times, alternative materials have been available to produce Turnout Gear.

339.    Members of the Class were known customers or end users of each Defendant's products and were therefore within the scope of the risk created by each Defendant's conduct and

were the foreseeable victims of the negligent manufacture and design of the PFAS-contaminated Turnout Gear and/or PFAS-contaminated components of Turnout Gear.

340. Each Defendant owed its customers, including Plaintiffs, Plaintiffs' members, Class Members, and other foreseeable users a duty of reasonable care to eliminate or minimize PFAS contamination in the Turnout Gear sold to its customers.

341. Defendants breached their duty to use reasonable care in one or more of the following ways:

    a. By failing to prevent the contamination of Turnout Gear and/or component parts of Turnout Gear used by Plaintiffs, Plaintiffs' members, and Class Members;

    b. By failing to cease the manufacture, sale, and/or distribution of PFAS-contaminated Turnout Gear and/or PFAS-contaminated component parts of Turnout Gear after learning of the adverse health consequences associated with exposure to PFAS;

    c. By failing to reduce or minimize the PFAS contamination in Turnout Gear and/or the component parts of Turnout Gear manufactured, sold and distributed by each Defendant;

    d. By failing to design and manufacture PFAS-free Turnout Gear and/or component parts of Turnout Gear as an alternative to the PFAS-contaminated gear and/or PFAS-contaminated component parts of Turnout Gear after learning of the adverse health consequences associated with PFAS exposure;

    e. By negligently failing to warn their products' users, including Plaintiffs, Plaintiffs' members, and members of the Class, that they were being exposed to dangerous levels of PFAS and the heightened risk of disease the Plaintiffs and Class Members acquired because of that exposure.

342. As a direct and proximate result of each Defendant's negligence, Plaintiff, Class Members, and their firefighters have suffered, presently suffer, and will continue to suffer, *inter alia*, additional costs in removal and disposal of such Turnout Gear and in replacing the Turnout Gear

with that that does not contain PFAS, additional out of pocket expenses, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

343.    Defendants are thus liable to Plaintiffs and members of the Class for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for the removal and disposal of such Turnout Gear and in replacing the Turnout Gear with that that does not contain PFAS, medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

## COUNT X
## Unjust Enrichment
## Individually and on Behalf of the Class Against All Defendants

344.    Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

345.    Defendants wrongful conduct include manufacturing, marketing, selling, and distributing PFAS Turnout Gear and other PFAS-products that are unreasonably dangerous, due to the health and environmental risks.

346.    Plaintiff and Class Members purchased and/or paid for PFAS Turnout Gear that they believed was safe; instead, the received  toxic, unsafe, and unreasonably dangerous PFAS Turnout Gear that caused physical and environmental injuries, and which continue to cause such injuries until it is destroyed and disposed of properly.

347.    Defendants conduct resulted in their receiving benefits and the wrongful receipt of profits.

348.    Defendants' retention of the benefits violates the principles of justice, good conscience, and equity.

349.    The benefits that Defendants received were to Plaintiff and Class Members' detriment.

350.    Under principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by Plaintiffs and Class Members.

351.    Plaintiff and Class Members seek restitution from Defendants for their wrongful conduct.

## COUNT XI
### Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*
### Individually and on Behalf of the Class Against All Defendants

352.    Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

353.    California Business and Professions Code Section 17200 *et seq.* prohibits acts of "unfair competition," which Section 17200 defines as including any  "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  CAL. BUS. & PROF. CODE § 17200.

354.    Defendants have engaged in unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code section 17200 *et seq.*  These acts or practices include, but are not limited to, the following:

   a.  Deceptively promoting the use of PFAS when they knew or should have known that PFAS pose serious risks of physical and environmental harm;

   b.  Misrepresenting the safety of PFAS and their PFAS-products, including PFAS Turnout Gear;

   c.  Concealing and suppressing material facts regarding the safety of PFAS and their PFAS-products, including PFAS Turnout Gear.

## COUNT XII
### Untrue or Misleading Advertising
### (Violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*)
### Individually and on Behalf of the Class Against All Defendants

355.    Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

356.    California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                              70

357.    Defendants have engaged in and continue to engage in acts or practices that constitute violations of the False Advertising Law, California Business and Professions Code Section 17500 *et seq.*

358.    Defendants, with the intent to induce Plaintiff, Class Members and others to purchase, pay for, and use PFAS, PFAS Turnout Gear, and other PFAS-products, made or caused to be made \and/or disseminated untrue or misleading statements concerning PFAS and their PFAS-products, which Defendants knew, or by the exercise of reasonable care should have known, were untrue or misleading at the time they were made.  Defendants' misrepresentations include, but are not limited to:

    a.    PFAS chemicals, PFAS Turnout Gear, and other PFAS-products are environmentally safe or benign;

    b.    PFAS chemicals, PFAS Turnout Gear, and other PFAS-products are safe and effective;

    c.    That PFAS chemicals, PFAS Turnout Gear, and other PFAS-products do not create environmental hazards, or that such hazards are negligible.

## COUNT XIII
### Violation of Additional State Consumer Protection Laws

359.    Plaintiff incorporates and realleges all preceding paragraphs, as if fully set forth herein.

360.    The Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices, including in violation of the state consumer protection statutes listed below.

361.    The Defendants have engaged in "unfair methods of competition" and "unfair or deceptive acts or practices," in violation of the Alaska Unfair Trade Practices and Consumer Protection Act, ALASKA STAT. ANN. § 45.50.471 *et seq.*

    a.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska UTPA") broadly prohibits "unfair methods of competition" and "unfair or deceptive acts or practices," including "using or employing deception, fraud,

false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, omission, or suppression in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged." ALASKA STAT. ANN. §§ 45.50.471(a), 45.50.471(b)(12).

b.  The Alaska Class Members are "consumers" within the meaning of ALASKA STAT. ANN. § 45.50.561(4).

c.  Defendants were engaged "in the conduct of trade or commerce" within the meaning of ALASKA STAT. ANN. § 45.50.471(a) including when they advertised, sold and distributed their PFAS-products.

d.  While in the "conduct of trade or commerce," Defendants employed deception and misrepresentation, they knowingly concealed, suppressed, and omitted material facts regarding the safety of their products, as the Turnout Gear purchased and paid for by the Alaska Class Members was laden with PFAS; and Defendants acted with the "intent that others rely upon the concealment, omission, or suppression." *See* ALASKA STAT. ANN. §§ 45.50.471(a), 45.50.471(b)(12).

e.  In the course of purchasing, paying for, and providing the Turnout Gear, the Alaska Class Members were deceived by Defendants' misrepresentations and their failure to disclose that their Turnout Gear was laden with PFAS, and that the PFAS were unreasonably dangerous.

f.  The Alaska Class Members reasonably relied on Defendants' misstatements and omissions, and they did not and could not reasonably unravel Defendants' deception on their own.

g.  Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h.   Defendants owed the Alaska Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Alaska Class Members.

i.   The Alaska Class members suffered ascertainable losses of money or property as a result of Defendants' deceptive and unfair practices.

j.   The Alaska Class Members suffered ascertainable loss, injury-in-fact, and actual harm as a proximate result of Defendants' actions.

k.   Defendants' violations present a continuing risk to the Alaska Class Members. In addition, Defendants' unlawful acts and practices affect the public interest.

l.   Alaska Class Members seek, *inter alia*, "to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater." ALASKA STAT. ANN. § 45.50.531(a).

m.   The Alaska Class Members further seek attorney's fees, costs, and any other just and proper relief available under the Alaska UTPA. ALASKA STAT. ANN. §§ 45.50.531(a),  45.50.537.

362.   The Defendants have engaged in fraudulent, deceptive, and misleading conduct in connection with the sale and advertisement of consumer goods and services, in violation of the Arizona Consumer Fraud Act ("Arizona CFA") (ARIZ. REV. STAT. § 44-1521 *et seq.*

a.   Under the Arizona CFA, "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

or advertisement of any merchandise . . . is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

b. Defendants Arizona Class Members are "person[s]" within the meaning of the Arizona CFA. *See* ARIZ. REV. STAT. § 44-1521(6).

c. Defendants' PFAS and PFAS-laden products are "merchandise" within the meaning of the Arizona CFA. *See* ARIZ. REV. STAT. § 44-1521(5).

d. In the conduct of trade or commerce, Defendants knowingly concealed, omitted, and suppressed material facts regarding the safety of PFAS and their PFAS-laden products. , with the intent that others rely upon the concealment, omission, or suppression.

e. In purchasing and paying for Turnout Gear, the Arizona Class Members were deceived by Defendants' misstatements and their failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Arizona Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants' concealment, omission, and suppression of material facts were likely to and did in fact deceive reasonable consumers.

h. Defendants owed the Arizona Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Class Members.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                            74

i. The Arizona Class Members suffered ascertainable loss, injury-in-fact, and actual harm as a proximate result of Defendants' actions.

j. Under the Arizona CFA, Arizona Class Members seek actual damages and punitive damages.

363. The Defendants have engaged in deceptive trade practices, in violation of the Colorado Consumer Protection Act ("Colorado CPA"), COLO. REV. STAT. ANN. § 6-1-101 *et seq.*

a. The Colorado CPA prohibits deceptive trade practices, including the "fail[ure] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. ANN. § 6-1-105(u).

b. Plaintiff, Colorado Class Members, and Defendants are "persons" within the meaning of under COLO. REV. STAT. § 6-1-102(6).

c. The Colorado Class Members are "consumers" for purposes of COLO. REV. STAT. § 6-1-113(1)(a).

d. Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

e. In the course of purchasing, paying for, and providing the Turnout Gear, the Colorado Class Members were deceived by Defendants' misrepresentations and their failure to disclose that their Turnout Gear was laden with PFAS and that the PFAS were unreasonably dangerous.

f. The Colorado Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

    h. Defendants owed the Colorado Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Class Members.

    i. Defendants' conduct proximately caused harm to the Colorado Class Members.

    j. Under the Colorado Consumer Protection Act, Plaintiff seeks monetary relief against each Defendant, including damages measured as (a) the "greater" of (I) "actual damages sustained," including prejudgment interest, (II) five hundred dollars, or (III) "[t]here times the amount of actual damages sustained," based on "clear and convincing evidence" of Defendants' "bad faith conduct." *See* COLO. REV. STAT. § 6-1-113.

    k. Plaintiff also seeks costs, attorneys' fees, and any other just and proper remedy under the Colorado CPA. *See* COLO. REV. STAT. § 6-1-113(2)(b).

364. The Defendants engaged in unfair, deceptive, and fraudulent business practices in violation of the Delaware Consumer Fraud Act, 6 Del. C.§ 2513 *et seq*.

    a. The Delaware Consumer Fraud Act prohibits unfair, deceptive, and fraudulent business practices, including by prohibiting "[t]he act, use, or employment by any person of any deception, fraud, . . . misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such . . . , omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." 6 Del C. § 2513(a).

    b. Plaintiff, Delaware Class Members, and Defendants are "persons" within the meaning of DEL. CODE TIT. 6, § 2511(7).

c. Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted material facts regarding PFAS and that that Turnout Gear purchased by the Delaware Class Members were treated with PFAS-laden products; Defendants suppressed negative information about PFAS and PFAS-laden products; and Defendants misrepresented the safety of PFAS and their PFAS-laden products, with the intent that others rely upon the concealment, omission, or suppression.

e. In purchasing their Turnout Gear, the Delaware Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Delaware Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants owed the Delaware Class a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Class Members.

i. Defendants' conduct proximately caused harm to the Delaware Class Members.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                77

j. The Delaware Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the Delaware Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Plaintiff seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Delaware CFA.

m. Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

365. Defendants engaged in deceptive commercial practices, in violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. ANN. 505/1 et seq.

a. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") declares several specific actions to be unlawful, including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

b. The Illinois Class Members are "consumers" within the meaning of 815 ILL. COMP. STAT. ANN. 505/1(e).

c. Defendants were engaged in "trade" and "commerce" within the meaning of 815 ILL. COMP. STAT. ANN. 505/1(f) when they sold their PFAS-laden products to Turnout Gear manufacturers.

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material facts that Turnout Gear purchased by the Illinois Class Members were treated with PFAS-laden products, with the intent that others rely upon the concealment, omission, or suppression.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                 78

e. In purchasing their Turnout Gear, the Illinois Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Illinois Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants knew or should have known that their conduct violated the ICFA.

i. Defendants owed the Illinois Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Illinois Class Members.

j. Defendants' conduct proximately caused harm to the Illinois Class Members.

k. The Illinois Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

l. Defendants' violations present a continuing risk to the Illinois Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

m. Pursuant to 815 ILL. COMP. STAT. ANN. 505/10a(a), the Illinois Class Members seek monetary relief against Defendants measured as the greater of

(a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

366.    The Illinois Class Members seek attorneys' fees and any other just and proper relief available under 815 ILL. COMP. STAT. ANN. 505/10a(c).Defendants' unfair business practices violated the Iowa Private Right of Action for Consumer Frauds Act, IOWA CODE § 714h.1 *et seq.*

    a.  The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

    b.  Each Defendant and each Iowa Class member is a "person" under IOWA CODE § 714H.2(7).

    c.  The Iowa Class Members are "consumers" as defined by IOWA CODE § 714H.2(3).

    d.  In purchasing their Turnout Gear, the Iowa Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

    e.  The Iowa Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

    f.  Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

    g.  Defendants knew or should have known that their conduct violated the Iowa CFA.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                      80

h.  Defendants owed the Iowa Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Iowa Class Members.

i.  Defendants' conduct proximately caused harm to the Iowa Class Members.

j.  The Iowa Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k.  Defendants' violations present a continuing risk to the Iowa Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l.  Pursuant to IOWA CODE § 714H.5, Plaintiff seeks actual damages, statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and wanton disregard for the rights of others, and attorneys' fees.

367.  The Defendants have engaged in unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act, MD. CODE ANN., COMM. LAW § 13-101 *et. seq.*

a.  The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE

**CLASS ACTION COMPLAINT**                                                      81

ANN., COMM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged. MD. CODE ANN., COMM. LAW § 13-302.

b. Defendants, Plaintiff, and Maryland Class Members are "persons" within the meaning of MD. CODE ANN., COMM. LAW § 13-101(h).

c. In purchasing their Turnout Gear, the Maryland Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

d. The Maryland Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

e. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

f. Defendants knew or should have known that their conduct violated the Maryland CPA.

g. Defendants owed the Maryland Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Class Members.

h. Defendants' conduct proximately caused harm to the Maryland Class Members.

i. The Maryland Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

j.   Defendants' violations present a continuing risk to the Maryland Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

k.   Pursuant to MD. CODE ANN., COMM. LAW § 13-408, Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

368.   Defendants have engaged in deceptive trade practices in violation of the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.005 *et seq*.

a.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020(1).

b.   Defendants, Plaintiff, and Missouri Class Members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

c.   Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

d.   In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material facts that Turnout Gear purchased by the Missouri Class Members were treated with PFAS-laden products, with the intent that others rely upon the concealment, omission, or suppression.

e.   In purchasing their Turnout Gear, the Missouri Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f.   The Missouri Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                                          83

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants knew or should have known that their conduct violated the Missouri MPA.

i. Defendants owed the Missouri Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants

j. Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Missouri Class Members.

k. Defendants' conduct proximately caused harm to the Missouri Class Members.

l. The Missouri Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

m. Defendants' violations present a continuing risk to the Missouri Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

n. The Missouri Class Members seek damages in amounts to be proven at trial, along with attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

369. Defendants engaged in unfair methods of competition and deceptive practices in the conducts of trade and commerce, in violation of the Montana Consumer Protection Act, MONT. CODE ANN. § 30-14-101 *et seq.*

a. The Montana Consumer Protection Act ("Montana CPA") prohibits "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." MONT. CODE ANN. § 30-14-103.

**CLASS ACTION COMPLAINT**                                                                  84

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

b. Defendants, Plaintiff, and the Montana Class members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102 (6).

c. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of MONT. CODE ANN. § 30-14-102 (8)(a).

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material facts that Turnout Gear purchased by the Montana Class members were treated with PFAS-infused products, with the intent that other rely upon the concealment, suppression, or omission.

e. In purchasing their turnout gear, the Montana Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

f. The Montana Class members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants knew or should have known that their conduct violated the Montana CPA.

i. Defendants owed the Montana Class members a duty to disclose the truth about PFAS-infused products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Montana Class Members.

j. Defendants' conduct proximately caused harm to the Montana Class members.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                            85

k. The Montana Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

l. Defendants' violations present a continuing risk to the Montana Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

m. The Montana Class members seek damages in amounts to be proven at trial, along with attorney's fees, costs, and punitive damages, and any other just and proper relief under MONT. CODE ANN. § 30-14-102(8)(a).

370. The Defendants have engaged in deceptive trade practices, in violation of the Nevada Deceptive Trade Practices Act, NEV. REV. STAT. § 598.0903 *et seq.*

a. The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. NEV. REV. STAT. § 598.0923(1)(b) provides that a "person engages in a 'deceptive trade practice" when in the course of his or her business or occupation he or she knowingly … [f]ails to disclose a material fact in connection with the sale or lease of goods or services."

b. In purchasing their Turnout Gear, the Nevada Class Members were deceived by Defendants' failure to disclose the material fact that their Turnout Gear was treated with PFAS-laden products.

c. The Nevada Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

d. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

e. Defendants knew or should have known that their conduct violated the Nevada DTPA.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                                 86

f. Defendants owed the Nevada Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Nevada Class Members.

g. Defendants' conduct proximately caused harm to the Nevada Class Members.

h. The Nevada Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

i. Defendants' violations present a continuing risk to the Nevada Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

j. The Nevada Class Members seek their actual damages, punitive damages, costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.Defendants have engaged in unfair business practices, in violation of the New Hampshire Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq*.

371. The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. REV. STAT. ANN. § 358-A:2.

a. The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. REV. STAT. ANN. § 358-A:2.

b. Defendants, Plaintiff, and New Hampshire Class Members are "persons" within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

c. Defendants' actions as set forth herein occurred in the conduct of trade and commerce within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

d. In purchasing their Turnout Gear, the New Hampshire Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e.  The New Hampshire Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the New Hampshire CPA.

h. Defendants owed New Hampshire Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS; that PFAS created an unreasonable risk of harm; and that the PFAS Turnout Gear posed serious environmental and health risks.  purchased by the New Hampshire Class Members; and intentionally concealed the foregoing from the New Hampshire Class Members.

i. Defendants' conduct proximately caused harm to the New Hampshire Class Members.

j. The New Hampshire Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct, as a direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the New Hampshire Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Because Defendants' willful conduct caused injury to Plaintiff's property through violations of the New Hampshire CPA, Plaintiff seeks recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

372. The Defendants have engaged in deceptive trade practices, in violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1 *et seq.*

a. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

b. Defendants, Plaintiff, and the New Jersey Class Members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

c. Defendants engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

d. In purchasing their Turnout Gear, the New Jersey Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The New Jersey Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden

products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the New Jersey CFA.

h. Defendants owed the New Jersey Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the New Jersey Class Members.

i. Defendants' conduct proximately caused harm to the New Jersey Class Members.

j. The New Jersey Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the New Jersey Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Plaintiff is entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

373. The Defendants have engaged in deceptive trade practices, in violation of the New Mexico Unfair Trade Practices Act , N.M. STAT. ANN. § 57-12-1 *et seq*.

a. The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or

other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

b. Defendants, Plaintiff, and the New Mexico Class Members are "person[s]" within the meaning of N.M. STAT. ANN. § 57-12-2.

c. Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined by N.M. STAT. ANN. § 57-12-2.

d. In purchasing their Turnout Gear, the New Mexico Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e.  The New Mexico Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the New Mexico UTPA.

h. Defendants owed the New Mexico Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the New Mexico Class Members.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

i. Defendants' conduct proximately caused harm to the New Mexico Class Members.

j. The New Mexico Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the New Mexico Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiff, the New Mexico Class Members seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; reasonable attorneys' fees and costs; and all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

374. The Defendants have engaged in deceptive trade practices, in violation of the New York Consumer Protection Statute General Business Law § 349.

375. The Defendants have engaged in unfair and deceptive trade practices, in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1 *et seq*.

a. North Carolina's Unfair and Deceptive Acts and Practices Act ("North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

b. Defendants engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

c. In purchasing their Turnout Gear, the North Carolina Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

d. The North Carolina Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden

products, and they did not and could not reasonably unravel Defendants' deception on their own.

e. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

f. Defendants knew or should have known that their conduct violated the North Carolina Act.

g. Defendants owed the North Carolina Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the North Carolina Class Members.

h. Defendants' conduct proximately caused harm to the North Carolina Class Members.

i. The North Carolina Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

j. Defendants' violations present a continuing risk to the North Carolina Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

k. Plaintiff seeks an order for treble their actual damages, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

376. Defendants have engaged in unlawful trade practices, in violation of the Oklahoma Consumer Protection Act, OKLA. STAT. TIT. 15, § 751 *et seq.*

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

a. The Oklahoma Consumer Protection Act ("Oklahoma CPA") provides that a "person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business, the person . . . [c]ommits an unfair or deceptive trade practice as defined in Section 752 of this title." OKLA. STAT. TIT. 15, § 753(21). Section 752(13) provides that a "deceptive trade practice" means "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."

b. Defendants, Plaintiff, and Oklahoma Class Members are "persons" within the meaning of OKLA. STAT. TIT. 15, § 752.

c. Each Defendant is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

d. In purchasing their Turnout Gear, the Oklahoma Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The Oklahoma Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the Oklahoma CPA.

h. Defendants owed the Oklahoma Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be

exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Oklahoma Class Members.

i. Defendants' conduct proximately caused harm to the Oklahoma Class Members.

j. The Oklahoma Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the Oklahoma Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Because Defendants' unconscionable conduct caused injury to Plaintiff, Plaintiff seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiff further seeks any other just and proper relief available under the Oklahoma CPA.

377. Defendants have engaged in unlawful business practices, in violation of the Oregon Unlawful Trade Practices Act, OR. REV. STAT. § 646.605 *et seq.*

a. The Oregon Unfair Trade Practices Act ("Oregon UTPA") provides that a "person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: . . . (u) Engages in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1)(u).

b. Each Defendant and each Oregon Class member is a "person" within the meaning of OR. REV. STAT. § 646.605(4).

c. Their PFAS-laden products are "goods" within the meaning of OR. REV. STAT. § 646.605(6).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

d. In purchasing their Turnout Gear, the Oregon Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The Oregon Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the Oregon UTPA.

h. Defendants owed the Oregon Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Oregon Class Members.

i. Defendants' conduct proximately caused harm to the Oregon Class Members.

j. The Oregon Class Members suffered ascertainable loss, injury-in-fact, and actual harm as a proximate result of Defendants' actions.

k. Defendants' violations present a continuing risk to the Oregon Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. The Oregon Class Members are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1), (8). Plaintiff is also entitled to

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

m. The Oregon Class Members seek attorneys' fees and any other just and proper relief available under OR. REV. STAT. § 646.638(1), (8).

378. Defendants have engaged in unfair trade practices, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. § 201-1 *et seq*.

a. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 PA. CONS. STAT. § 201-2(4).

b. Defendants, Plaintiff, and Pennsylvania Class Members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

c. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

d. Defendants are liable to Plaintiff for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a).

379. Defendants have engaged in unfair trade practices, in violation of the South Carolina Unfair Trade Practices Act, S.C. CODE ANN. § 39-5-10 *et seq*.

a. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

b. Each Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

c.  Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiff's damages should be trebled.

d.  Plaintiff further alleges that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

380.  Defendants have engaged in deceptive trade practices, in violation of the South Dakota Deceptive Trade Practices And Consumer Protection Law, S.D. CODIFIED LAWS § 37-24-6 *et seq.*

a.  The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") provides that it is a "deceptive act or practice for any person to … (1) Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby . . . ." S.D. CODIFIED LAWS §§ 37-24-6.

b.  In purchasing their Turnout Gear, the South Dakota Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

c.  The South Dakota Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

d.  Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

**CLASS ACTION COMPLAINT**                                                                                                    98

e. Defendants knew or should have known that their conduct violated the South Dakota CPL.

f. Defendants owed the South Dakota Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the South Dakota Class Members.

g. Defendants' conduct proximately caused harm to the South Dakota Class Members.

h. The South Dakota Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

i. Defendants' violations present a continuing risk to the South Dakota Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

j. Under S.D. CODIFIED LAWS § 37-24-31, the South Dakota Class Members are entitled to a recovery of their actual damages suffered as a result of Defendants' acts and practices.

381. Defendants have engaged in deceptive trade practices in violation of the Texas Deceptive Trade Practices and Consumer Protection Act, TEX. BUS. & COMM. CODE § 17.4 *et seq*.

a. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful . . . ." TEX. BUS. & COMM. CODE § 17.46(a). The Texas DTPA further declares that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the

following acts: several specific actions to be unlawful, including: . . . (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed . . . ."

b.  Their PFAS-laden products are "goods" within the meaning of TEX. BUS. & COMM. CODE § 17.45(1).

c.  Defendants, Plaintiff, and the Texas Class Members are "persons" within the meaning of TEX. BUS. & COMM. CODE § 17.45(3).

d.  Each Plaintiff and each Texas Class member is a "consumer" within the meaning of TEX. BUS. & COMM. CODE § 17.41(4).

e.  Defendants committed the acts complained of herein in the course of "trade" and "commerce" within the meaning of TEX. BUS. & COMM. CODE § 17.41(6).

f.  In purchasing their Turnout Gear, the Texas Class Members were deceived by Defendants' knowing failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

g.  The Texas Class Members reasonably relied on Defendants' knowing omissions, and they did not and could not reasonably unravel Defendants' deception on their own.

h.  Defendants' knowing concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

i.  Defendants knew that their conduct violated the Texas DTPA.

j.  Defendants owed the Texas Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental

and health risks; and Defendants intentionally concealed the foregoing from the Texas Class Members.

k.  Defendants' conduct proximately caused harm to the Texas Class Members.

l.  The Texas Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

m.  Defendants' violations present a continuing risk to the Texas Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

n.  As a direct and proximate result of Defendants' violations of the Texas DTPA, the Texas Class Members have suffered injury-in-fact and/or actual damages.

o.  Plaintiff seeks monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

p.  Alternatively, or additionally, pursuant to TEX. BUS. & COMM. CODE § 17.50(b)(3) & (4), the Texas Class Members are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

382.  Defendants have engaged in unfair business practices in violation of the Washington Consumer Protection Act, WASH. REV. CODE ANN. § 19.86.010 *et seq.*

a.  The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.96.010.

b.  Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

c. In purchasing their Turnout Gear, the Washington Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

d. The Washington Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

e. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

f. Defendants knew or should have known that their conduct violated the Washington CPA.

g. Defendants owed the Washington Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear – which would foreseeably be exposed to extreme heat and off-gas toxic fumes – posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Washington Class Members.

h. Defendants' conduct proximately caused harm to the Washington Class Members.

i. The Washington Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

j. Defendants' violations present a continuing risk to the Washington Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**
102

k. Defendants are liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE ANN. § 19.86.090.

## VII.  PRAYER FOR RELIEF

383. Plaintiff and the Class request relief as follows:

a. That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of both Classes, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class Members;

b. Certification of the proposed Nationwide or California Class;

c. Appointment of the undersigned counsel for the proposed Nationwide or California Class;

d. Compensatory damages for physical injuries and property damage caused by the PFAS Turnout Gear migration and contamination in an amount to be determined at trial;

e. Damages for the costs to properly retrieve, remove, destroy and dispose of PFAS Turnout Gear an amount to be determined at trial;

f. Damages against defendant for the cost of replacing all PFAS Turnout Gear in an amount to be determined at trial;

g. Restitution of all amounts by which Defendants were unjustly enriched, including revenues received related to PFAS Turnout Gear, in an amount to be determined at trial;

h. Punitive damages against Defendants in an amount to be determined at trial;

i. Attorneys' fees and costs;

j. Pre-judgment and post-judgment interest as allowed by law; and

k.  Any and all such other and further relief as this Court deems just and proper.

## VIII.    JURY DEMAND

384.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Dated: March 18, 2026

Respectfully submitted,

/s/ Adam J. Zapala
Joseph W. Cotchett (SBN 36324)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christopher F. Jeu (SBN 247865)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

***Counsel for Plaintiff and the Proposed Class***